**NORTHWEST CENTRAL PIPELINE CORPORATION, Plaintiff,**

v.

**MESA PETROLEUM COMPANY, Arco Oil and Gas Company, Cabot Petroleum Corporation, JER Partnership, Ellis Petroleum, Inc., Yuma County Oil Company, Amoco Production Company, Prima Energy Corporation, Carlyle Petroleum, Inc., Alpar Resources, Inc., John P. Lockridge, Individually and MTS Limited Partnership, Defendants.**

Civ. A. No. 85–K–631.

United States District Court, D. Colorado.

Aug. 21, 1986.

Michael S. McCarthy, Catherine A. Lemon, Conover, McClearn & Heppenstall, Denver, Colo., Hall, Estill, Hardwick, Gable, Collingsworth & Nelson, Inc., Tulsa, Okl., for plaintiff.

Robert D. Inman, Theodore M. Smith, Inman, Erickson & Flynn, Denver, Colo., for defendants JER and Yuma.

Barry W. Spector, Denver, Colo., M.W. Parse, Jr., Murray Fogler, Fulbright & Jaworski, Houston, Tex., Thomas Callahan, Callahan & Callahan, Wray, Colo., Robert

J. Kapelke, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for Cabot.

William F. Demarest, Jr., Jose P. Ceppi, D'Amico, Luedtke, Demarest & Golden, Washington, D.C. and Gary C. Davenport, McGloin, Davenport & Severson, Denver, Colo., for Alpar, Amoco, Carlyle, Prima and Lockridge.

Jeffrey A. Chase, Holme Roberts & Owen, Denver, Colo., for Mesa & MTS Ltd.

## AMENDED MEMORANDUM OPINION AND ORDER

KANE, District Judge.

Plaintiff Northwest purchases natural gas from defendants. Northwest originally filed a complaint in state court, removed here pursuant to 28 U.S.C. § 1441, seeking a declaration of the effect federal oil and gas deregulation has had upon the contractual rights and obligations of the parties. Venue is proper under 28 U.S.C. § 1391. Several motions are currently pending before me [1]: (1) defendants' motion that I reconsider plaintiff's leave to file its second amended complaint; (2) plaintiff's motion to remand Cabot Petroleum; and (3) cross motions for partial summary judgment and plaintiff's motion to refer regulatory issues to FERC concerning whether the statutory deregulation date of 114 subject gas wells is January 1, 1985 or July 1, 1987.

### I. Reconsideration of Leave to File Amended Complaint

■ Plaintiff's February 10, 1986 motion for leave to file an amended complaint was granted on February 11, 1986. On February 14, 1986 defendants Amoco, Prima, Carlyle, Alpar & Lockridge moved for reconsideration of my order granting plaintiff leave to amend. This motion is denied. Fed.R.Civ.P. 15(a), states, in language unique in its liberality, that leave to amend

---

1. The following motions, while pending before me as well, are summarily dismissed as moot: Plaintiff's August 27, 1985 motion for scheduling order concerning motions for summary judgment; Defendants' November 12, 1985 motion to strike the affidavit of J.B. Killerlain submitted in conjunction with previous motions for summary judgment; and Defendants' January 31, 1986 request for oral argument.

"*shall* be *freely* granted when justice so requires".

The new legal theory of plaintiff's complaint is that the ambiguity of the contracts' current price term constitutes a failure of mutual assent which is fatal to the contracts' very existence. In my order of April 24, 1986, I held that the contract is ambiguous and unamenable to summary resolution with respect to the current price term in § 3. I did not address whether this ambiguity is a fatal omission of an essential term. Nor do I now. Plaintiff's claim of lack of mutual assent is, however, plausible. Justice requires that plaintiff be afforded an opportunity to advance this theory.

Defendants assert that allowing leave to amend would cause them prejudice. They apparently assert that a lack of mutual assent claim renders their litigation efforts to date, premised upon the existence of a contract, a waste of time and effort. This asserted prejudice is insufficient cause for me to deny leave to amend. First, the defendants' efforts and arguments premised upon the existence of a contract are not necessarily mooted. I have no opinion as to the ultimate tenability of plaintiff's latest claim. It is quite possible that the ambiguity is not fatal. If such is the case, defendants' efforts will not have been in vain and no prejudice will have been suffered.

Moreover, assuming defendants' worst case scenario, it is primarily their pocketbooks and not their right to a just determination by this court which is prejudiced. This is insufficient to override Rule 15's command that leave to amend be freely granted.

## II. *Plaintiff's Motion to Remand Cabot Petroleum*

Defendant Cabot Petroleum filed suit against plaintiff over their contract in Yuma County District Court on February 5, 1985. Plaintiff filed a "mirror image" suit against defendants, including Cabot, in Denver District Court on February 8, 1985. On February 2, 1985 plaintiff petitioned the Colorado Panel on Multi-District Litigation to transfer the Yuma action to Denver for consolidation with the Denver action. While the parties awaited a ruling on plaintiff's petition to transfer and consolidate, the Denver action was removed to federal district court by defendant Alpar Resources on March 4, 1985. On April 19, 1985 the Panel declined to transfer and consolidate. Plaintiff now moves for an order remanding alone its claims against Cabot to the Denver district court. This motion is denied.

Plaintiff and Cabot are non-diverse. Both parties assume their case presents no questions of federal law. Given this presumption[2], their dispute is not within my original jurisdiction. Plaintiff is correct, then, in stating that Cabot has no "absolute right" to remain before me. 28 U.S.C. § 1441(c) speaks to this situation:

> Whenever a separate and independent claim or cause of action, which would be removable if sued upon alone, is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, *may remand all matters not otherwise within its original jurisdiction.*

(Emphasis added). Variously put,

> [T]he remand of matters not otherwise within the federal court's original jurisdiction is left to the sound discretion of the trial court. The district judge may remand all of the non-federal matters, may retain all of them, or may remand some and retain some.

14A C. Wright, A. Miller and E. Cooper, *Federal Practice and Procedure,* § 3724 at 403–06 (2d ed. 1985). *See also, Johnson Builders, Inc. v. United Brotherhood of Carpenters and Joiners, Local Union No. 1095, AFL–CIO,* 422 F.2d 137, 140 (10th Cir.1970).

---

**2.** I accept this presumption without discussion because resolution of this point is not necessary to my decision to decline plaintiff's motion to remand.

■ The primary factors informing my discretionary decision to retain or remand a removed case which lacks its own jurisdictional basis are the convenience of the parties and judicial economy, i.e., the avoidance of duplicative judicial effort. *Leinberger v. Webster,* 66 F.R.D. 28, 33 (E.D.N.Y.1975) ("The real question is whether the interests of the parties and of judicial economy would derive any benefit from a remand ..."). *See also, Twentieth Century—Fox Film Corp. v. Taylor,* 239 F.Supp. 913 (S.D.N.Y.1965); *rev'd on other grounds, Gardner and Florence Call Cowles Foundation v. Empire, Inc.,* 754 F.2d 478, 482, n. 5 (2nd Cir.1985).

■ Plaintiff's argument that remand facilitates convenience and judicial economy is premised on the assumption that the Yuma action *will* be transferred to Denver and consolidated with the would be remanded Denver district action. Thus, all the parties witnesses, documents and attorneys, in both the state and federal suits, plaintif argues, will be present in Denver. Plaintiff's bold assumption is based on two occurences: (1) the Panel's issuance of an order to Cabot requiring it to show cause why its case should be transferred, and (2) the Panel's denying plaintiff's motion to transfer and consolidate, but granting plaintiff leave to renew its motion should the federal case be remanded.

I am uncertain plaintiff's assumption is correct. The circumstances which at one time compelled the Panel to favor transfer and consolidation no longer exist. At the time of the Panel's show cause order neither the Yuma nor Denver district (now "federal") actions had progressed past the preliminary stages of litigation. Ordering transfer and consolidation would not have infringed upon the Yuma district court's adjudication of the issues before it. Since then, however, the Yuma action has progressed speedily. Much of the expense, inconvenience and duplicity which transfer and consolidation might have avoided has already occured. I do not believe the Panel would be as inclined to divest the Yuma court of its jurisdiction as it was a year and a half ago.

If I were to remand Cabot and the Panel declined to transfer and consolidate the Yuma action and the remanded Denver district action, convenience and judicial economy would not be significantly advanced. Contrary to plaintiff's argument, the litigants, witnesses and attorneys would be burdened by three law suits, (i.e. Yuma, Denver district and Denver federal), all involving the same issues. As things stand now, there are only two "mirror image" law suits.

Assuming, arguendo, that the Panel would respond to my remand order by ordering transfer and consolidation, remand still does not appreciably effect judicial economy. There would still be two suits addressing the identical issues of statutory deregulation applicability and contract interpretation. Remand would eliminate little if any duplication of judicial effort.

Nor does the parties' convenience call for remand. Admitting that there are necessarily going to be two suits on identical issues, plaintiff would rather try both suits at one situs, Denver. Plaintiff states that both parties, their witnesses and counsel are from out of state. Travel to Denver, plaintiff contends, is more convenient *for both parties* than travel to Yuma County. Plaintiff cannot legitimately argue the convenience the alternative forums present to Cabot. Cabot prefers to try its case in Yuma County. Insofar as a party should be the arbiter of its own preferences, the inconvenience the alternative locales present to the parties is equal. Forcing Cabot to litigate in Denver causes it as much inconvenience, in a judicially cognizable sense, as requiring plaintiff to litigate in Yuma County. Moreover, since the Yuma proceedings are somewhat advanced, much of the inconvenience plaintiff wishes to avoid has already occurred.

Finally, I find plaintiff's multi-dimensional forum manipulation unbecoming of principled advocacy. Plaintiff is playing one jurisdiction off of the other, using each as a means to acheive its ends in the other.

While this tactic evinces a keen awareness of the interplay of some of the rules of civil procedure, it will afford plaintiff no relief from this quarter. Accordingly, plaintiff's motion to remand Cabot is denied.

### III. *Deregulation: January 1, 1985 v. July 1, 1987*

■ Defendants Amoco, Prima, Carlyle, Alpar and Lockridge assert that 114 of the wells subject to the parties' contracts, as set forth in Appendix A of defendant's partial motion for summary judgment, are not deregulated until July 1, 1987.[3] Plaintiff contends the wells were deregulated on January 1, 1985. Based on this contention, plaintiff began to cease paying defendants the regulated price for their gas in the early months of 1985. Rather, plaintiff paid variable market rates for the gas.

### A. *Regulatory Background*

The Natural Gas Policy Act establishes a complex system of price ceilings for natural gas. The FERC has determined that tight sands gas, such as that from the wells, presents "extraordinary risks or costs" and that it should, therefore qualify for a special incentive price prescribed pursuant to the FERC's authority under 15 U.S.C. § 3317(c)(5) (Section 107). A definitional element of the tight sands gas category is that the gas also meet the requirements for either "new natural gas" under 15 U.S.C. § 3312(c) (Section 102) or be from a "new onshore production well" pursuant to 15 U.S.C. § 3313(c) (Section 103).

15 U.S.C. § 3331 (section 121) implicitly provides for the deregulation of a tight sands gas, as it provides for § 102 or § 103 gas which is subsumed in a tight sands (high cost gas) determination. *See* FERC General Counsel's Interpretation to Amoco, defendants' memorandum in support of mo-

tion for partial summary judgment, appendix C. The distinction between § 102 and § 103 gas is crucial. § 102 gas is necessarily deregulated on January 1, 1985. § 103 gas, if produced from a depth of greater than 5,000 feet is also deregulated on January 1, 1985. However, 103 gas from 5,000 feet or less is not deregulated until July 1, 1987.

The Colorado Oil and Gas Conservation Commission has ruled the subject wells are within 15 U.S.C. 3317(c)(5)'s (section 107) definition of high cost natural gas.[4] In making its "107 only" determination the COGCC did not specifically pronounce whether 102 or 103 (deep or shallow) formed the basis of its 107 finding. There is no dispute that the 107 finding implicitly included a determination that the substantive criteria of 103 (shallow) had been met. This is because the defendants had only submitted 103 (shallow) evidence for the COGCC's consideration. If the COGCC had made an explicit or implicit 102 finding as well, FERC Order No. 406, pp. 31,228–19, 49 *Fed.Reg.* 48748, provides that where gas may be placed within two deregulatory gas categories, the category with the earlier deregulation date shall control.

The difference between 102(c) and 103 (shallow) wells is the distance of the subject well from a "marker well" 102(c)(1)(B) provides that 102 new natural gas is simply 103 (shallow) gas (i.e. gas from a new onshore well) located outside of a 2.5 mile radius from any well marker. 15 U.S.C. 3301(5)(A) defines marker well as "any well from which natural gas was produced in commercial quantities at any time after January 1, 1970 and before April 20, 1977."

### B. *Cross Motions for Partial Summary Judgment*

Summary judgment pursuant to Fed.R. Civ.P. 56 is a drastic remedy which is ap-

---

3. A number of pleadings set forth the parties' arguments with respect to the deregulation issue: Cross motions for partial summary judgment; plaintiff's motion for leave to submit separable regulatory issue for decision by the FERC; and defendant Lockridge's motion for preliminary injunction. This preliminary injunction motion has already been denied per my order of July 31, 1986, but the parties' argu-

ments concerning it have been considered in resolving the summary judgment and referral motions.

4. As well, each of these wells in question is located in the Niobrara formation of northeastern Colorado which the FERC has designated as a tight formation. 18 C.F.R. 271.703(2) (1985).

propriate only where there exist no genuine issues of material fact. As a matter of law, the movant must show entitlement to summary disposition beyond all reasonable doubt. In order to determine the propriety of summary judgment, I must construe all pleadings, affidavits, and depositions liberally in favor of the party against whom the motion is made. Where differing inferences can be drawn from conflicting affidavits, depositions and pleadings, summary judgment should not be granted. *United States, Etc. v. Santa Fe Engineers, Inc.,* 515 F.Supp. 512, 513 (D.Colo.1981).

Defendant gas producers move for a partial summary judgment on the issue of deregulation. They assert that a determination of eligibility from the appropriate jurisdictional agency, (the COGCC), is prerequisite to deregulatory treatment. With respect to the subject wells, defendants argue, the COGCC has only implicitly determined the wells to be within § 103 (shallow) which are deregulated on July 1, 1987. No § 102 determination was ever made. As a matter of law, defendants contend, the gas is not deregulated until July 1, 1987.

Plaintiff's cross motion for partial summary judgment is based on the fact that in reality, notwithstanding the lack of a COGCC determination, the gas also qualifies as being produced from § 102(c) wells which have been deregulated since January 1, 1985. In support of this proposition, plaintiff submits the affidavit of J.B. Killerlain, director, sales and supply of Northwest. Killerlain swears that there are no marker wells within 2.5 miles of any subject wells. As noted above, the sole pertinent difference between § 102 and § 103 wells wells is the proximity of marker wells. Such being the case, the gas factually falls within § 102(c) and was subject to deregulation on January 1, 1985.

In their brief in response to plaintiff's motion for partial summary judgment, p. 4, defendants admit to having stipulated that no marker wells exist within 2.5 miles of the wells in question.[5] They insist, however, "this fact is *irrelevant* to the legal issues involved in this litigation". *Id.* (Emphasis in original).

For § 102 gas to be subject to § 121(a)(1)'s deregulation on January, 1 1985 it must be "new natural gas [as defined in § 102(c)]". 102(c) requires the new natural gas determination be made "in accordance with Section 503 [15 U.S.C. § 3413]." Section 503 states that for the purposes of § 102(c) gas, the determination must be made by the appropriate state or federal agency. With an eye toward these statutes, defendants state that agency determination is an integral part of the entire deregulatory scheme. Agency determination, they argue, is a definitional prerequisite. The COGCC has never made a § 102(c) determination. It is in this light that defendants assert the "real world" fact of the wells being within the statutory definition of § 102(c) gas is of no legal relevance; all that matters are the "COGCC facts."

Defendants' argument has illusory appeal. Agency determination *is* a vital component of the statutory definition of new natural gas. But the plot thickens. It is beyond dispute that the COGCC did not even consider § 102 evidence. When defendants sought their "107 only" determination, they only submitted § 103 (shallow) evidence. [Hence, the COGCC's implicit 103 (shallow) determination.] Why this was done is obvious. Given the declining oil and gas market, a deregulated price is necessarily a lower price. The producer/defendants had absolutely no incentive to submit evidence which would have deregulated their gas. The purchaser/plain-

---

5. At certain points in their argument defendants state they do not concede this point. In no event, however, do they offer any evidence to the contrary. When a motion for summary judgment is supported by affidavit, as is plaintiff's, "an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavit or otherwise ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). Accordingly, for purposes of the present motions for summary judgment there is no factual dispute as to the location of the subject wells with respect to the marker wells.

tiff attempted to submit evidence in support of a § 102(c) determination. The COGCC rebuked these efforts, however, holding on April 21, 1986 that plaintiff, as purchaser, lacked standing to file well applications or submit protests to a producer's well applications. The COGCC held that "pursuant to FERC's deregulation ... the Commission accepts applications only from the operator or a working interest owner with notification of such filing." Report of the Commission, April 21, 1986, (plaintiff's brief for partial summary judgment, Exhibit 2).

15 U.S.C. § 3413(c)(3) engrafts the state agency's procedure onto the federal regulatory scheme:

*Procedures applicable.* Determinations of a federal or state agency referred to in § (a)(1) [concerning §§ 102 or 103 gas] shall be made in accordance with the procedures generally applicable to such agency for the making of such determinations under the provisions of federal or state law, as the case may be, pursuant to which they exercise their regulatory jurisdiction.

Incorporating the COGCC procedures into the entire regulatory scheme, it is clear that a gaping hole eviscerates the intent and efficacy of the Natural Gas Policy Act. The statutes do not provide for a purchaser to invoke the price deregulation provisions. This legislative oversight is understandable in light of economic conditions at the time of the NGPA's enactment. The underlying premise of the deregulatory scheme was that energy prices would continue to rise or remain high. Order No. 406, pp. 31,224–25. If this presumption retained validity, producers would have incentive to invoke the deregulatory process. Now, with a depressed energy economy, that incentive no longer exists. As the instant circumstance indicates, the statutory gap has rendered the deregulation provisions jejune.

1. *Looking Behind the Statute*

In *American Tobacco Co. v. Patterson,* 456 U.S. 63, 69, 102 S.Ct. 1534, 1537, 71

L.Ed.2d 748 (1982), the Supreme Court stated:

As in all cases involving statutory construction, "our starting point must be the language employed by Congress," ... and we assume "that the legislative purpose is expressed by the ordinary meaning of the words used." ... Thus, *"[a]bsent a clearly expressed legislative intention to the contrary,* that language must ordinarily be regarded as conclusive."

(Citations omitted, emphasis added).

In the instant case, Congress *has* clearly expressed an intention contrary to the results which would be produced by blind adherence to a poorly written, gap-ridden statute. It is the obvious omission of a mechanism to determine price in a depressed energy market which compels me to look past the deficient statutory language.

In *U.S. v. Rogers,* 602 F.Supp. 1332, 1339 (D.Colo.1985), I recently held that in the case of an omission on the face of a statute, I must divine the legislative intent. Consideration of legislative history is usually an aid and precursor to statutory interpretation. In this case, however, I do not wish to "interpret" the statute. I understand what all the provisions say. Rather, I peruse the legislative history in order to discern how best to resolve the deregulation issue before me in a manner consistent with the intent behind the passage of the NGPA. Clearly Congress did not intend to create this conundrum.

Defendants cite *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1979), for the proposition that I must blindly apply the NGPA's "in accordance with Section 503" language, and require COGCC determination, without consideration of the decimating effect such application would have upon the NGPA's primary deregulatory objectives. *TVA,* however, is readily distinguishable.

*TVA* concerned the Endangered Species Act of 1973, 16 U.S.C. § 1533 *et seq..* Under § 4 of that Act, the Secretary of the

Interior has the power to declare certain species endangered and their environs a "critical habitat". Pursuant to § 7 of the Act. the secretary has the power to compel all federal agencies to take such action as necessary to ensure that actions by them do not destroy an endangered species' critical habitat.

In 1967 the TVA began construction of the Tellico Dam and Reservoir Project on the Little Tennessee River in the State of Tennessee. The project was planned to have impounded water covering about 16,-500 acres, and to have converted the shallow swiftly flowing river into a deep reservoir over 30 miles long. *Id.*, 437 U.S. at 155, 97 S.Ct. at 2283, 57 L.Ed.2d at 123.

In 1975 the secretary declared an obscure little trout, the snail darter, an endangered species. Upon extensive investigation it was discovered that the "snail darter was only found in the Little Tennessee river" and that "the proposed impoundment of water behind the proposed Tellico Dam would result in total destruction of the snail darter's habitat". *Id.*, 437 U.S. at 160, 97 S.Ct. at 2285, 57 L.Ed.2d at 126. Accordingly, the secretary declared the area of the Little Tennessee which would have been affected by the Tellico Dam, a critical habitat. Under the act, therefore, the TVA was precluded from completing the dam.

The TVA challenged the applicability of the Endangered Species Act to a project such as the Tellico Dam which had begun before the Act's enactment and had been substantially completed at great expense to the taxpayers. These pleas fell on unsympathetic ears; the Supreme Court ruled that completion of the dam and reservoir project must be enjoined. In so ruling, the Court noted that it was not a super-legislature, substituting its judgment for that of Congress. The Court held that

> [w]hen confronted with a statute which is plain and unambiguous on its face we ordinarily do not look to legislative history as a guide to its meaning.

*Id.*, 437 U.S. at 18, 97 S.Ct. at 2296, 57 L.Ed.2d at 140.

Herein lies the first distinction between *TVA* and the instant case. The Endangered Species Act was enacted *after* the initial appropriation for the Tellico Dam. Failure to except the dam was not a legislative oversight but a well considered decision:

> [T]he legislative history undergirding § 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species. The pointed omission of this type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the "primary missions" of federal agencies.

*Id.*, In this case, however, the decline in natural gas prices did not occur until after the NGPA's enactment. Failure to provide statutorily for such an event is a fatal omission—tantamount to an ambiguity. *See, Rogers,* 602 F.Supp. at 1339. This unwitting omission justifies my looking behind the face of the statute and discerning legislative purpose.

Second, and more importantly, the strict statutory interpretation by the court in *TVA* advanced congressional purpose:

> While there is no discussion in the legislative history of precisely this problem, the totality of congressional action makes it abundantly clear that the result we reach today is wholly in accord with both the words of the statute and the intent of Congress. The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute.

*Id.*

In the present case, the blind application of the ACT's "in accordance with Section 503" language, as advanced by defendants, would frustrate rather than further the manifest purpose of the NGPA. That purpose is the subjection of natural gas prices to the tug and pull of the marketplace. I

will discuss this at greater length below. The Supreme Court's discussion of the Endangered Species Act's legislative history, after decrying its consideration, strongly implies that where a questionable statute, due to omission or ambiguity, is at odds with clear legislative intent, legislative history is properly considered and may remedy the omission.[6]

### 2. *Legislative Intent: Deferring to the Invisible Hand*

FERC Orders No. 406, 49 *Fed.Reg.* 47874 and No. 406A, 49 *Fed.Reg.* 50637 address the problem of deregulation in a declining energy market and the pertinent NGPA legislative history. FERC Orders are entitled to substantial deference. *Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); *Jones v. FDIC,* 748 F.2d 1400, 1405 (10th Cir.1984). In these Orders FERC not only held that gas dually qualified as regulated and deregulated shall be considered deregulated, but also noted that such interpretation is

> consistent with the overall scheme envisioned by Congress when it enacted the NGPA—to provide incentive prices to encourage exploration and development of new reserves in the short term, *and to substitute market forces for regulated prices by phasing in deregulation in 1985 and 1987.*

Order No. 406, p. 31,229 (emphasis added).

1985 and 1987, and the deregulation these years bring, are now upon us. The initial objective of increasing supply has now been supplanted by deregulation. Inadequate reserves is no longer the considered problem. It is doubtful that artificially high prices would encourage exploration as purchasers, at that price, are rare. In any event, without regard to whether high regulated prices encourage exploration and increase reserves, the legislative scheme now clearly favors deregulation. As noted by FERC, Congress enacted the NGPA

> in the belief that the marketplace could ascertain the value of a commodity in relation to supply and demand and allocate gas resources better than the regulated environment. Deregulation will accelerate the market trend to competitive affordable gas prices.

*Id.,* at 31,229. Further, deregulation is not a voluntary program:

> Deregulation appears to be mandatory. Producers cannot opt out of the statutory scheme on January 1, 1985 merely because market conditions are unfavorable ... To ignore this fact invalidates the Congressional intent evident in the NGPA scheme of phased decontrol. The NGPA was created to phase from regulated ceiling prices in the short term to market clearing prices in the long term ...

*Id.*

> Some producer's claim reliance on the incentive price in Section 107(c)(5) and in Section 108, and state that the Commission can not arbitrarily deny their ability to collect the incentive price. The Commission believes that this reliance is misplaced. It should have been clearly understood that the incentive price was to be statutorily removed by Section 121 for

---

**6.** Defendants also cite *Board of Governors of the Federal Reserve System v. Dimension Financial Corp.,* —— U.S. ——, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986) in support of its argument that a statute should be strictly applied notwithstanding the injustice such application would produce. The Supreme Court in *Dimension Financial* forbade the FED from broadly construing the definition of the term "bank" to include financial institutions as such a construction conflicted with the definition set forth in the statute. This case is distinct. Though speaking in broad general terms, the conduct censured by the Court was that of the FED. The FED is not an Article III court, with inherent power and obligation to see that the will of Congress is clarified and justice done. Further, the concern of *Dimension Financial,* that legislative history is an inaccurate indicator of legislative intent because individual legislators might differ as to the motivation and goals of any given legislation, is not present here. As discussed in the text, FERC Orders No. 406 and No. 406A make clear that the undisputed unanimous intent behind the NGPA is deregulation.

Section 102(c) and qualifying Section 103 gas.

*Id.*, at 31,230, Order 406A at 31,247.

Congress surely did not intend for producers to avoid deregulation by withholding information upon which a regulatory agency would make a determination of deregulation. Nor did Congress intend to deny standing to apply for well deregulation to the only party with incentive to present pertinent deregulatory facts. Yet, this is exactly the anamolous result which rigid application of the "in accordance with Section 503" language would wrought. This will not be permitted. This case presents one of those rare incidents where effectuating Congress' intent requires judicial gap filling.

The foregoing point is insufficiently recognized except in one field: it is often stated that the Constitution must be expounded so as to adjust to current conditions. For example, the First Amendment guarantees freedom of the press. In 1787 the printing press was the only instrument by which ideas could be spread. With the possible exception of Nostradamus, no one by that time had even imagined the marketing of ideas and information by means of radio or television. The Framers of the Constitution were concerned, however, with the spread of ideas, not with the particular machinery with which it was done. So as new means such as radio and television come into place, they receive the protection afforded by the First Amendment. Such decisions are not reckless manipulations of unwarranted activism. On the contrary, they are a strict adherence to the intent of the Framers achieved by the avoidance of mindless literalism. This same process widely accepted in constitutional interpretation applies equally to statutory construction; it is the intent of the legislators which must control.

Defendants make an exhaustive argument, supported by numerous legislative drafts and memoranda, to the effect that requiring agency determination of gas categories is an integral part of the statutory scheme. Requiring agency determination,

they argue, is a rational function of Congress' legitimate "enforcement related concerns". *See*, Appendix G, Lockridge's preliminary injunction reply brief. Without agency determination, these documents effectively assert, deregulation would be subject to producers' whims and economic fancies. Defendants argument is well taken. But it is *my* enforcement related concerns which compel me to recognize that the subject gas qualifies as § 102(c)(1) and is deregulated on January 1, 1985. If I do not make this determination, in the void left by the COGCC's de facto abdication of responsibility, the NGPA's deregulation provisions will go unenforced. If I do not make this determination, deregulation will ride on the winds of producers' economic fortunes. My job is to apply the law as I see it. The NGPA requires this gas be deregulated.

In *Frank Spooner (Spirit Petroleum),* 36 FERC ¶ 61,019 (July 2, 1986) and *Hogan Exploration Inc. and Trident Oil and Gas Corp.*, 33 FERC ¶ 61,055 (Octover 17, 1985), the FERC denied regulated status to wells which met the substantive criteria of regulated gas categories for want of agency determination. Defendants cite these cases for the proposition that agency determination is not a mere legal technicality but a definitional prerequisite. Defendants argue that these cases mandate that I take a similar "hard line". I disagree; *Spooner* and *Hogan* are inapposite on their facts. First, there is no evidence that these producers' failure to apply for regulated pricing treatment was a wilfull attempt to gain economic advantage for themselves. On the contrary, the *Spooner* and *Hogan* producers had incentive to apply for a determination of regulability. Second, conformance with proper procedure by the producers in those cases would have brought the wells within a regulated pricing provision. The FERC was disinclined toward leniency as such liberality would have contravened the NGPA's ultimate objective of total deregulation. In the instant case, my departure from a rigid application of the "in accordance with Section 503" language

serves the NGPA's deregulatory purpose. Finally, *Spooner* and *Hogan* did not involve a gap in the statutory scheme produced by the unanticipated and precipitous decline in natural gas prices. Dilatory producers created the legal problems in those cases.

### 3. *The Interests of Justice*

Fairness requires me to fill the voids caused by congressional omission and COGCC disinterest. In a case recognizing the goals of the administrative and judicial processes, the Fifth Circuit noted that

> Petitioners would inhibit FERC flexibility by imposing on it a restrictive model of appellate court functions and limitations. Administrative agencies are not bound by such narrow conceptions, however, and this court has traditionally construed the Commission's power expansively so that it may flexibly deal with complex problems.

*Ecee, Inc. v. FERC*, 645 F.2d 339, 351 (5th Cir.1981). Similarly, in the face of a complex problem, my flexibility is the key to resolution of the present issues.

I am moved by plaintiff's good faith attempts to proffer § 102 evidence and the COGCC's repeated rejections of this evidence. Defendants could have provided this information, but for obvious economic reasons refused to do so. For practical purposes, given the COGCC's obduracy and the defendants' self-serving forebearance, no § 102 determination was possible. Defendants' argument that "real world facts" are irrelevant in the absence of the COGCC's recognition of such facts is untenable in light of defendants' coralling of those facts. Defendants' rationale is an exercise in casuistry, elevates form over substance and would subserve injustice if I were to accept it.

There is no factual dispute as to all the subject wells being located at a distance greater than 2.5 miles from a marker well. The gas from these wells, therefore, being produced from a new tight formation and being new onshore wells, are deregulated as of January 1, 1985 pursuant to § 121(c)(1). Defendants' motion for partial summary judgment is denied. Plaintiff's cross motion for partial summary judgment is granted.[7]

It is hereby ordered that:

(1) Defendants' motion for reconsideration of plaintiff's leave to file amended complaint is denied;

(2) Plaintiff's motion to remand Cabot is denied;

(3) Defendants' motion for partial summary judgment is denied; and

(4) Plaintiff's cross motion for partial summary judgment is granted.

---

7. Plaintiff's alternative motion for submission of the regulatory issue to FERC is denied as moot. In choosing to rule on the summary judgment motions, however, I considered defendants' arguments respecting the inefficiency and uneconomy of submitting issues to FERC, especially those in which it has no special expertise. *See, Mississippi Power and Light Co. v. United GAs Pipeline Company*, 532 F.2d 412 (5th Cir.1976).