**AMOCO PRODUCTION COMPANY, a Delaware corporation, Plaintiff-Appellant,**

v.

**WESTERN SLOPE GAS COMPANY, a Colorado corporation, Defendant-Appellee.**

No. 82–1581.

United States Court of Appeals, Tenth Circuit.

Feb. 5, 1985.

Rehearing Denied May 6, 1985.

Robert J. Kapelke of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo. (Charles W. McDermott and Lawrence P. Terrell of Gorsuch, Kirgis, Campbell, Walker & Grover, and R.H. Landt, Denver, Colo., with him on brief), for plaintiff-appellant.

James R. McCotter, Denver, Colo. (Marla S. Petrini, Denver, Colo., with him on brief) of Kelly, Stansfield & O'Donnell, Denver, Colo., for defendant-appellee.

Before HOLLOWAY, BARRETT, and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Amoco Production Company brought this diversity action against Western Slope Gas Company alleging breach of a contract to sell natural gas. Amoco claims that the terms of the contract entitle it to a price increase for its intrastate gas equal to the maximum price allowable for newly discovered gas under sections 102 and 105 of the Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3312, 3315 (1982), even though most of the gas is not new gas within the meaning of the Act. The district court examined the circumstances surrounding the contract, concluded that the parties did not intend to give Amoco this price increase, and granted judgment for Western Slope. 535 F.Supp. 1305 (D.Colo.1982). On appeal, Amoco argues that the contract is not ambiguous and that the district court therefore erred in resorting to extrinsic evidence. Alternatively Amoco urges that even if the district court properly considered extrinsic evidence, the evidence does not support its decision. We disagree and affirm.

## I.

## BACKGROUND

Amoco's predecessor in interest and Western Slope entered into a gas purchase agreement in 1961 that provided for the intrastate sale of natural gas to Western Slope from wells in La Plata County, Colorado. The contract was effective for a primary term of twenty years and thereafter from year to year unless terminated by either party. Neither party has sought termination and the contract is now in its extended term.

The contract provides a specific price for gas sold from March 1961 through December 31, 1968. For each five-year period thereafter, the contract sets a price of fifteen cents per 1,000 cubic feet (Mcf) or such higher price as the parties determine under a price renegotiation clause.[1] The parties did not renegotiate the contract price until October 1973, when they executed an agreement covering sales from January 1, 1974 through December 31, 1978 (the "1973 Letter Agreement"). The 1973 Letter Agreement established the contract price at the higher of (a) a base price of 33 cents (plus two cents for the value of recoverable liquids contained in the purchased gas), escalated by one cent per year, or (b) the price determined according to the following escalation clause:

---

[1]. Price renegotiation clauses, like favored nations clauses and area rate clauses, are a form of indefinite price escalation clause. The renegotiation clause in this case provides that if the parties are unable to agree upon a negotiated price the contract will terminate at the commencement of the five-year period. In the event of such termination, the gas cannot be offered to an alternative purchaser at a price lower than that which Western Slope has indicated is acceptable without first providing Western Slope an opportunity to purchase the gas at the lower price.

"The price or rate established from time to time by the Federal Power Commission (or any successor agency) as the area ceiling price or rate so authorized, for the specific area within which subject gas well or wells are located, subject to the general terms and conditions established by the FPC including heating value and applicability to specific wells." Pl.Ex. 7, at 1.[2]

The parties began negotiating a new pricing arrangement during the summer of 1978 in anticipation of the end of the 1973 Letter Agreement. Western Slope initiated matters with a proposed letter agreement dated July 3, 1978 that provided for a price equal to the higher of a base price of 55 cents, plus one cent annual escalation, or the price established by a price escalation clause that was in substance equivalent to that used in the 1973 agreement.

Arles Barrett negotiated for Amoco and James Valenta negotiated for Western Slope. Although Barrett had Amoco's authorization to accept the escalation clause as initially proposed, he insisted that certain additions be made to the clause before he would recommend acceptance. By letter on July 18, Western Slope's proposal was returned to Valenta with Barrett's changes noted in the margins. On July 21, Western Slope sent Amoco a revised proposal that incorporated Barrett's additional language, and on August 2 Amoco signed the new agreement (the "1978 Letter Agreement"). With Barrett's additions italicized, the relevant pricing provision and escalation clause of the 1978 Letter Agreement reads as follows:

"In accordance with Article 5.1(a), Buyer and Seller hereby agree that the following price schedule shall be effective January 1, 1979. The price of gas to Seller shall be either 1 or 2 below, whichever results in a greater price to Seller.

1. Effective January 1, 1979, the price shall be fifty-five cents (55¢) per Mcf....
(a) For each succeeding one (1) year period thereafter, the price shall be increased one cent 1¢) per Mcf at 14.73 psia.
2. The price or rate established from time to time *by the enactment of any federal law* or by the Federal Energy Regulatory Commission [FERC] (or any successor agency) as the ceiling price or *national* rate for the specific area within which subject gas well or wells are located, subject to the same general terms and conditions applicable to such price or rate, including but not limited to quality, pressure and vintage conditions."

Pl.Ex. 8 (emphasis added). The crux of Amoco's case lies in this italicized language.

On November 9, 1978, Congress enacted the Natural Gas Policy Act, 15 U.S.C. §§ 3301 *et seq.* (1982) (NGPA or the Act). The NGPA erects a comprehensive regulatory scheme establishing maximum lawful prices, or ceiling prices, for all wellhead sales of gas in the United States, whether intrastate or interstate. The Act creates categories for different types of wellhead sales,[3] prescribing an initial ceiling price for each category and a specific formula for raising that ceiling price each succeeding month. The NGPA further provides that, where gas falls within the scope of multiple categories prescribing different ceiling prices, the highest ceiling price is applicable. NGPA § 101(b)(5), 15 U.S.C. § 3311(b)(5). The Act generally adopts an incentive-based approach to rate setting by providing substantially higher prices for recently developed gas sources than for gas obtained from older, previously drilled wells. *See Pennzoil v. FERC*, 645 F.2d 360, 367 (5th Cir.1981), *cert. denied*, 454

---

**2.** The Federal Power Commission was later succeeded by the Federal Energy Regulatory Commission (FERC). *See* § 402(a) of the Department of Energy Organization Act, 42 U.S.C. § 7172(a); Exec.Order No. 12009, 42 Fed.Reg. 46,267 (1977).

**3.** These categories include new natural gas (NGPA § 102), new onshore production well gas

(§ 103), existing interstate gas (§ 104), existing intrastate contract gas (§ 105), rollover contract gas (§ 106), high-cost gas (§ 107), stripper well gas (§ 108), and a residual, catch-all category for gas not classified under any other section (§ 109). 15 U.S.C. §§ 3312–3319.

U.S. 1142, 1002 S.Ct. 1000, 71 L.Ed.2d 293 (1982).

All of the gas sold by Amoco to Western Slope is covered by section 105(b)(1) of the Act, 15 U.S.C. § 3315(b)(1), which applies to gas being sold in intrastate commerce as of the day Congress enacted the NGPA.[4] Section 105 provides, in pertinent part:

"(a) **Application.**—The maximum lawful price computed under subsection (b) of this section shall apply to any first sale of natural gas delivered during any month in the case of natural gas, sold under any existing contract or any successor to an existing contract, which was not committed or dedicated to interstate commerce on November 8, 1978.

(b) **Maximum lawful price**—

(1) **General rule.**—Subject to paragraphs (2) and (3), the maximum lawful price under this section shall be the lower of—

(A) the price under the terms of the existing contract, to which such natural gas was subject on November 9, 1978, as such contract was in effect on such date; or

(B) the maximum lawful price, per million Btu's computed for such month under section 3312 of this title [NGPA § 102] (relating to new natural gas)."

15 U.S.C. § 3315. Thus, the maximum lawful price that a seller may obtain under section 105 for gas that is sold entirely intrastate is the price under the terms of the existing intrastate contract, limited by a rate equal to that given in the referenced section 102 of the Act, 15 U.S.C. § 3312.

At the relevant time in this case, section 102 would have prescribed a maximum price of $2.07 for Amoco's gas, as compared to the unescalated contract price of approximately 55¢. Although section 105 states that the maximum lawful price is the *lower* of the contract price and the section 102 price, Amoco argues that the parties' intention in adding the Barrett language to the 1978 escalation clause was "to set the contract price at the highest price allowed by federal law for all the gas sold under the contract." Brief of Appellant at 17. Since section 105 uses the section 102 new gas price ceiling as the highest possible price for intrastate gas, Amoco contends it is entitled to escalate its price to the section 102 price.

Western Slope's response is that the section 102 prices are incentive prices intended for newly developed or difficult to develop gas, and none of the gas under this contract qualifies under the location or vintaging criteria set out in section 102. *See* 15 U.S.C. § 3312(a), (c), (d), (e). Western Slope points out that the escalation clause in the 1978 Letter Agreement specifically conditions price escalation on Amoco's gas meeting all the criteria under the new federal law, "including but not limited to quality, pressure and vintage conditions." It argues that Amoco's approach reads these conditions out of the escalation clause.[5]

Western Slope contends that the escalation clause was intended merely to ensure that Amoco would receive for its *intra* state gas the maximum established price for *inter* state gas, because as a practical matter, interstate sales were the only alternatives available to Amoco if it chose not to sell its gas to Western Slope.[6] Western

---

**4.** Since all of the gas sold under the Amoco-Western Slope contract is covered by § 105, the maximum price established by that section will determine the maximum price for the gas at issue here. Although part of the gas also qualifies under section 103, 15 U.S.C. § 3313, which governs new, onshore production wells drilled after February 1977, and a small portion of the gas meets the criteria of section 108, 15 U.S.C. § 3318, which sets the ceiling price for stripper well natural gas, we are not concerned with these two categories.

**5.** Amoco's answer to this argument is that section 105 itself sets no conditions on its applicability other than that the gas involved be intrastate. Section 105 does not set any location or vintaging conditions as does § 102. It merely uses § 102's maximum price for new gas as an upper limit on what may be charged for intrastate gas, whether new or old.

**6.** The 1973 escalation clause was tied exclusively to the area ceiling price set by the Federal Power Commission, which at that time was authorized to establish maximum rates only for interstate natural gas sales, not intrastate sales.

Slope asserts that the inclusion of Barrett's additional phrase "by the enactment of any federal law" was meant only to ensure that if the impending federal legislation set new price maximums for *inter* state sales—thus replacing the administrative prices set by the FERC—Amoco would be protected and would receive the benefits of these legislated price ceilings.

The District Court examined the circumstances surrounding the 1978 Letter Agreement and the renegotiation of the contract in 1973. From this extrinsic evidence, the court concluded that the parties intended the 1978 Letter Agreement escalation clause, like the one in 1973, to tie "the price of the intrastate gas sale to the price permitted for interstate gas sales." Rec., vol. I, at 145. The court found that

> "[w]ith the Middle East oil crisis, the industry was well aware that Congress was likely to make direct entry into the picture, and, accordingly when the agreement came up for renegotiation, both Amoco and Western Slope wanted to insert language intended to include anticipated legislation and both anticipated Congressional action concerning 'new oil' and 'old oil.'"

*Id.* at 145–46. The court determined that "the purpose of adding the [Barrett] language to the 1978 agreement was to be sure that the intrastate sale by Amoco to Western Slope would be protected by any vintaging sections of the then proposed law which applied to gas sold in interstate commerce." *Id.* at 147.

On appeal, Amoco argues first that the contract language is unambiguous and that the district court therefore erred in looking at extrinsic evidence to discern the parties' intent. Second, Amoco contends that even if use of extrinsic evidence was proper in this case, the evidence fails to support the court's conclusions.

## II.

### EXTRINSIC EVIDENCE

■ Amoco argues that under Colorado law a court may not resort to extrinsic

evidence unless the contract is ambiguous on its face. This rule is used in Colorado in certain contexts. *See, e.g., Buckley Bros. Motors, Inc. v. Gran Prix Imports, Inc.,* 633 P.2d 1081, 1083 (Colo.1981) (en banc) (land contract); *Radiology Professional Corp. v. Trinidad Area Health Association, Inc.,* 195 Colo. 253, 577 P.2d 748, 750 (1978) (en banc) (professional services contract); *In re Marriage of Blair,* 649 P.2d 344, 345 (Colo.App.1982) (marital settlement agreement). As Western Slope points out, however, Colorado has adopted the Uniform Commercial Code, Colo.Rev. Stat. §§ 4-1-101 *et seq.* (1973 & Cum.Supp. 1983), which applies to the present contract for the sale of natural gas. *See id.* §§ 4-2-102, 107(1); *Pennzoil Co.,* 645 F.2d at 387; *Columbia Gas Transmission Corp. v. Larry H. Wright, Inc.,* 443 F.Supp. 14, 19 (S.D.Ohio 1977). The UCC changes the common law of contracts in a number of ways, including in particular the use of extrinsic evidence.

Section 2–202 of the Code, Colo.Rev.Stat. § 4-2-202, sets out the UCC's version of the parol evidence rule:

> "**4–2–202. Final written expression— parole or extrinsic evidence.** Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein, may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
>
> (a) By course of dealing or usage of trade (section 4-1-205) or by course of performance (section 4-2-208); and
>
> (b) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

The FPC was later succeeded by the FERC, and thus as initially proposed by Western Slope, the

1978 escalation clause merely substituted the FERC for the FPC.

The Official Comment makes clear that section 2–202 is intended to alter the ordinary parol evidence rules. Thus it states:

"1. This section definitely rejects:

(a) Any assumption that because a writing has been worked out which is final on some matters, it is to be taken as including all the matters agreed upon;

(b) The premise that the language used has the meaning attributable to such language by rules of construction existing in the law rather than the meaning which arises out of the commercial context in which it was used; and

(c) The requirement that a condition precedent to the admissibility of the type of evidence specified in paragraph (a) is an original determination by the court that the language used is ambiguous.

2. Paragraph (a) makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used. Similarly, the course of actual performance by the parties is considered the best indication of what they intended the writing to mean.

3. Under paragraph (b) consistent additional terms, not reduced to writing, may be proved unless the court finds that the writing was intended by both parties as a complete and exclusive statement of all the terms. If the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then

evidence of their alleged making must be kept from the trier of fact."

*Id.* Official Comment 1–3.

Under the UCC, the lack of facial ambiguity in the contract language is basically irrelevant to whether extrinsic evidence ought to be considered by the court as an initial matter. A judge first must consider the circumstances and purposes surrounding the making of the writing before he or she can determine whether it is in fact ambiguous.[7] "[I]t is proper to consider the contract's commercial setting even though the contract is not facially ambiguous." *Pennzoil,* 645 F.2d at 388; *see also Southern Concrete Services, Inc. v. Mableton Contractors, Inc.,* 407 F.Supp. 581, 582–83 (N.D.Ga.1975) *aff'd mem.,* 569 F.2d 1154 (5th Cir.1978); Colo.Rev.Stat. 4–1–205, Official Comment 1 (meaning of agreement to be determined by language used and action read and interpreted in light of commercial practices and other surrounding circumstances); *see also* J. White & R. Summers, Handbook on the Uniform Commercial Code § 2–10 at 79–80 (2d ed. 1980).

Moreover, under section 2–202, there is no longer an assumption that the parties intended a writing to be the complete expression of their agreement. In fact, the assumption is to the contrary unless the court expressly finds that the parties intended the contract to be completely integrated. *S.M. Wilson & Co. v. Smith International, Inc.,* 587 F.2d 1363, 1370 (9th Cir.1978); White & Summers, § 2–9 at 77–78. *See generally, Interform Co. v. Mitchell,* 575 F.2d 1270, 1274–78 (9th Cir. 1978). Only if in light of the circumstances and purposes of the contract the judge finds it unambiguous should he or she prohibit parol evidence to explain its meaning. *Pennzoil,* 645 F.2d at 388. The district court made no such finding in this case.

As the court in *Pennzoil* said:

---

7. Indeed, even in non-UCC Colorado cases, support exists for assessing the ambiguity of contracts in light of the surrounding circumstances. *See Lorenzen v. Mustard's Last Stand,* 196 Colo. 265, 586 P.2d 12, 14 (1978) (en banc); *National*

Sales Corp. v. Dennis, 93 Colo. 536, 27 P.2d 499, 500 (1933); *Dickson v. Dick,* 59 Colo. 583, 151 P. 441, 443 (1915). *Accord,* 3 A. Corbin, Corbin on Contracts § 542 (196).

"[A]mbiguity often arises from the application of the contract to the subject matter of the agreement, and extrinsic evidence is admissible to remove and explain any ambiguity in the contract as applied. Ambiguity easily arises when the contract is applied to its subject matter in changed circumstances. Area rate clauses are certainly ambiguous as applied to the collection of currently available ceiling rates for natural gas. A contract should be interpreted in light of the changed circumstances to accomplish what the parties intended."

*Pennzoil,* 645 F.2d at 388 (citation omitted). Thus the district court did not err in using extrinsic evidence to determine the intent of the parties.

### III.

### SUBSTANTIAL EVIDENCE

■■■ Amoco next argues that, even if the district court properly considered extrinsic evidence in this case, that evidence does not support its decision. If a contract's construction depends upon extrinsic facts and circumstances, then its terms become questions of fact. *Jaeco Pump Co. v. Inject-O-Meter Manufacturing Co.,* 467 F.2d 317, 320 (10th Cir.1972); *Metropolitan Paving Co. v. City of Aurora,* 449 F.2d 177, 181 (10th Cir.1971); *Union Rural Electric Association, Inc. v. Public Utilities Commission,* 661 P.2d 247, 251 n. 5 (Colo.1983) (en banc). Findings of fact by a district court will remain undisturbed on appeal unless they are clearly erroneous. Fed.R.Civ.P. 52(a); *Volis v. Puritan Life Insurance Co.,* 548 F.2d 895, 901 (10th Cir.1977). Under the clearly erroneous rule, reversal is required only if our review of the record leaves us with a definite and firm conviction that a mistake has been made. *Dowell v. United States,* 553 F.2d 1233, 1235 (10th Cir.1977); *Davis Cattle Co. v. Great Western Sugar Co.,* 544 F.2d 436, 439 (10th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977). When a matter is tried to the court, "we must view the evidence in the light most favorable to the prevailing party and give it the benefit of all inferences that may reasonably be drawn therefrom." *Ahern v. Veterans Administration,* 537 F.2d 1098, 1100 (10th Cir.1976); *Hart v. Western Investment & Development Co.,* 417 F.2d 1296, 1300 (10th Cir.1969). After a careful review of the evidence viewed in this light, we are convinced that the district court did not commit reversible error.

■■ The court heard testimony from Mr. Barrett for Amoco and Mr. Valenta for Western Slope. After reviewing this testimony and the other evidence in the case, the court held that the parties did not intend, by the addition of the Barrett language, to give Amoco any greater right to escalate than it had had under the 1973 Letter Agreement. The court found that the purpose of both escalation clauses was merely to ensure that Amoco could exact from Western Slope a gas price equal to the maximum possible price Amoco could obtain from Western Slope's competitors. Since the only competitors for this particular wellhead gas were interstate gas purchasers, the price escalation clauses were meant to provide the maximum lawful price set by the federal government for interstate gas.

Until 1978 and the enactment of the NGPA, the maximum lawful price for interstate gas had been established in the regulations of a federal agency, first the FPC and then later the FERC. The parties knew during the negotiations leading to the 1978 Letter Agreement, however, that imminent federal legislation might change the gas price structure. The district court found that by inserting the Barrett language the parties only intended to ensure that Amoco would not be prejudiced if the new legislation set higher prices for interstate gas than the administrative prices set by the FERC. The court found the parties did not intend to give Amoco the additional right to escalate to any maximum lawful price set by the new legislation for *intra*state gas.

The record contains substantial evidence supporting the district court's decision. First, the 1973 Letter Agreement was tied

exclusively to interstate gas prices for legitimate business reasons. Second, there is evidence in the record that the 1978 Letter Agreement merely continued this pricing arrangement, keying price increases under the contract to FERC prices for *interstate* sales of gas. Barrett himself admitted this, rec., vol. II, at 48, and the 1978 Western Slope price proposal provides further evidence. The base price in the 1978 agreement was 55 cents per Mcf, which was at or a cent or two above the going rate in 1978 for interstate gas. *See id.* at 44–45, 88. Valenta testified that Barrett knew this base price reflected the current interstate market price, and that this was the basis for their negotiated price. *Id.* at 88, 91. Further, like the 1973 agreement, the 1978 escalation clause specified that Amoco could escalate to the ceiling prices established by the FERC only if its gas met certain conditions applicable to those prices. One of the conditions specifically delineated in the 1978 escalation clause was "vintaging,"[8] which had been a key determinant since 1976 of what price producers were allowed to charge under FERC regulations for interstate sales of gas. Nothing in the record suggests that vintaging was ever a factor with respect to intrastate gas. Finally, and perhaps most significantly, minutes from an Amoco division committee meeting held in July 1978 show without doubt that Amoco understood Western Slope's proposed escalation clause to be limited to maximum price ceilings established for gas sold only interstate, not intrastate.[9]

To the extent the evidence was conflicting, the district court believed Western Slope rather than Amoco. The record evidence is such that we are not left with a definite and firm conviction that the district court made a mistake.

AFFIRMED.

---

8. "Vintaging" refers to the "spud date," the date on which drilling is commenced. Rec., vol. II, at 49.

9. The committee minutes state:
"Amending contract #48606 with Western Slope Gas Company consistent with the 5 year price redetermination provision to increase the price of gas from 39¢/Mcf to 55¢/Mcf effective January 1, 1979 plus 1¢ each year thereafter. Such price shall be adjusted for Btu and taxes. Under the Amendment, Amoco may receive a higher price if gas of the same vintage is sold from the field in interstate commerce at a price higher than the stipulated contract price. Either party may terminate the gas contract in 1981."
Def. Ex. S.