NORTHWEST CENTRAL PIPELINE CORPORATION, renamed Williams Natural Gas Company, Plaintiff–Appellant,

v.

JER PARTNERSHIP; Ellis Petroleum Corporation, Inc.; Yuma County Oil Corporation, Inc.; Prima Energy Corporation; Alpar Resources, Inc.; Talus Properties Ltd.; John P. Lockridge, Defendants–Appellees.

NORTHWEST CENTRAL PIPELINE CORPORATION, renamed Williams Natural Gas Company, Plaintiff–Appellee,

v.

JER PARTNERSHIP; Yuma County Oil Corporation, Inc., Defendants–Appellants,

and

Ellis Petroleum Corporation, Defendant.

Nos. 90–1067, 90–1090.

United States Court of Appeals, Tenth Circuit.

Aug. 30, 1991.

John T. Schmidt of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, Okl. (C. Kevin Morrison and Wade R. Wright of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, Okl., Michael S. McCarthy and Catherine A. Lemon of Faegre & Benson, Denver, Colo., and Lewis A. Posekany, Gen. Counsel of Williams Natural Gas Co., Tulsa, Okla., with him on the briefs), for plaintiff-appellant.

Theodore M. Smith, Denver, Colo. (Barry W. Spector, Denver, Colo., with him on the briefs), for defendants-appellees/cross-appellants, Yuma County Oil Co. and JER Partnership.

Gary C. Davenport of McGloin, Davenport, Severson and Snow, Denver, Colo. (Eric A. Beltzer of McGloin, Davenport, Severson and Snow, Denver, Colo., William F. Demarest, Jr. of Holland & Hart, Washington, D.C., with him on the briefs), for defendants-appellees, Prima Energy Corp., Alpar Resources, Inc., Talus Properties Ltd. Partnership, and John P. Lockridge.

Before ANDERSON and McWILLIAMS, Circuit Judges, and ALLEY,* District Judge.

STEPHEN H. ANDERSON, Circuit Judge.

Williams Natural Gas Company ("Williams") appeals a district court order granting judgment to defendant/appellees. We affirm.

## BACKGROUND

This dispute involves the interpretation of three long-term natural gas purchase contracts. Williams operates an interstate natural gas pipeline. In 1982, Williams [1]

---

* Honorable Wayne E. Alley, United States District Judge for the Western District of Oklahoma, sitting by designation.

1. During the period relevant to this litigation, Williams was also known as Cities Service Gas Company and Northwest Central Pipeline Company. As a result, the record often refers to

entered into a series of contracts to purchase natural gas from producers in Yuma County, Colorado. The three contracts in dispute here are with Yuma County Oil Company ("Yuma"), JER Partnership ("JER"), and a collection of entities referred to as "the Lockridge Group" (Alpar Resources, Inc., Talus Properties Limited Partnership, and John P. Lockridge). Each of the contracts is a "take-or-pay" agreement for a term of twenty years.

When the contracts were executed, the gas involved was price regulated under the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. § 3301, *et seq.* Almost all of the wells covered by the contracts produce gas from the Niobrara formation, a designated "tight formation" for purposes of special incentive pricing under § 107 of the NGPA, 15 U.S.C. § 3317. *See* 18 C.F.R. § 271.-703(d)(20).[2] On January 1, 1985, the § 107 gas involved in the contracts became deregulated pursuant to § 121 of the NGPA. *See Northwest Central Pipeline Corp. v. Mesa Petroleum Co.*, 643 F.Supp. 280 (D.Colo.1986).[3] On January 4, 1985, Williams wrote each of the appellees and informed them that, pursuant to deregulation, Williams was exercising its contract right to "market out" of the agreements. The appellees disputed the existence of any such right to withdraw from the contracts, and this litigation ensued.

The contract language at issue is found in Section 3, which provides as follows:[4]

3. *Price*

For all gas received by Bonny for the account of Buyer under this Contract less Seller's gas used by Bonny as compressor fuel, Buyer shall pay Seller by check on or before the 25th day of the next calendar month succeeding each Fiscal Month in which such gas had been delivered, the applicable one of the following prices for the gross heating value

thereof as determined pursuant to Section 4(g):

(a) For gas received during the month of January, 1982, the price shall be three dollars and three tenths cents ($3.003) per million (1,000,000) Btu's.

(b) For gas received during each succeeding month thereafter, the price per million (1,000,000) Btu's shall be the applicable maximum lawful price determined in accordance with the Natural Gas Policy Act of 1978, as such price may be revised from time to time by the Federal Energy Regulatory Commission.

(c) Notwithstanding anything herein to the contrary, it is agreed that if the Federal Energy Regulatory Commission as heretofore defined is exercising pricing jurisdiction over the gas purchased and sold hereunder, the price to be paid for such gas shall be equal to the applicable maximum lawful rate approved by such authority. If such authority shall at any time or from time to time authorize, prescribe, approve or permit a maximum lawful price or prices, however determined, applicable to the gas being sold and delivered hereunder, which is higher than the price otherwise applicable hereunder, then the price for gas sold hereunder shall be increased to equal such higher maximum lawful price effective as of the date such authority allows the same to become effective. Whenever the provisions of Paragraph (c) or (d) of this Section effectuate an increase in price, such increased price including any adjustments, reimbursements and/or escalations shall thereupon be substituted for and become the applicable Contract price hereunder.

(d) *In the event the regulation of the price at which natural gas is sold ceases in whole or in part, or is modified, so as to allow for the sale of gas hereun-*

---

Williams under one of these other names. We uniformly use the appellant's current company name.

**2.** Two of the 74 wells producing gas involved in the contracts are "stripper wells," regulated under section 108 of the NGPA, 15 U.S.C. § 3318.

**3.** The gas from the two stripper wells also became deregulated the same day. *See FERC v. Martin Exploration Management Co.*, 486 U.S. 204, 108 S.Ct. 1765, 100 L.Ed.2d 238 (1988).

**4.** Recited is the actual language of the Lockridge contract. Minor differences in the other contracts are insignificant to this litigation.

*der at redetermined prices, then Seller shall have the right to request a redetermination of the price at which natural gas is to be sold hereunder.* Any such request shall be made in writing and shall in the first instance be made during the six (6) month period immediately following the effective date of such deregulation and subsequently at any time during the six (6) month period preceding each yearly anniversary of the effective date of such deregulation. The redetermined price, including tax reimbursement, to be paid during each such period shall be the arithmetic average of the two (2) highest prices then being paid by two different gas transmission companies pursuant to contracts for gas of substantially the same quality and quantity, and produced within the Denver Julesburg Basin, plus the escalations and reimbursements provided for therein. The redetermined price will become effective in the first instance on the effective date of deregulation and subsequently on each yearly anniversary date of such deregulation, but in no event shall the redetermined price result in a price which is less than five dollars and fourteen and four-tenths cents ($5.144) effective January 1, 1982, with an escalation of ten percent (10%) per year thereafter. *If at any time Buyer determines in its sole judgment that it is uneconomical to continue to purchase Seller's gas at the price established in this Paragraph (d), then, Buyer may terminate this Contract upon thirty (30) days written notice to Seller;* provided, however, within said thirty (30) day period, Seller may reduce the redetermined price to the highest price Buyer may find to be compatible with the economic operation of Buyer's pipeline, in which event this Contract shall not be terminated under this Paragraph (d).

(e) If the Federal Energy Regulatory Commission or any other authority shall at any time authorize, prescribe, approve or permit a price for High–Cost Natural Gas (as described in Section 107 of the Natural Gas Policy Act of 1978) including, without limitation, High–Cost gas

from Tight Formations, applicable to the gas sold hereunder, which price is in excess of the price as determined in Paragraphs (a), (b), (c) or (d) hereof then Seller shall receive a price not less than the highest price in Paragraphs (a), (b), (c) or (d) or the applicable maximum lawful price prescribed, approved or permitted by the Federal Energy Regulatory Commission pursuant to their incentive pricing authority granted in Section 107 Paragraph (b) of the Natural Gas Policy Act of 1978.

(f) In addition to the other pricing provisions of this Section 3, Buyer agrees to compensate Seller for production-related costs which the FERC determines may be paid pursuant to section 110(a)(2) and/or Section 122(e) of the Natural Gas Policy Act of 1978. If, at any time, the FERC will not permit Buyer to include any production-related costs incurred by Buyer hereunder in Buyer's then effective gas tariff, Seller agrees to promptly pay to Buyer upon receipt of notice thereof or Buyer may, without further notice, deduct from the monthly gas purchase proceeds paid to Seller pursuant to this Contract the amount of money which Buyer is not allowed to include in its rates for such production-related costs. The term "production-related costs" as used herein shall mean any cost or expense incurred by Buyer relating to any compressing, gathering, treating, dehydrating, conditioning or liquefaction of natural gas subject to this Contract or any other production-related cost as so defined or designated by the FERC that is incurred by Buyer pursuant to this Contract.

R. Vol. I, Tab 21 at Exhibit G ("GAS PURCHASE CONTRACT" Dated February 26, 1982 between JOHN LOCKRIDGE ET AL "Seller" and CITIES SERVICE GAS COMPANY "Buyer" and BONNY GATHERING SYSTEM "Gatherer") (emphasis added).

Williams originally filed suit in Colorado state court on February 8, 1985. On March 4, 1985, the case was removed to the United States District Court for the District of

Colorado. On April 24, 1988, the Honorable John L. Kane ruled on the parties' cross-motions for summary judgment. Interpreting Section 3(d), he held that a precondition for Williams's right to "market out" of the contracts was a seller request for price redetermination. Since it was undisputed that no such request had occurred, he ruled against Williams, as a matter of law, on its claimed right to market out of the contracts. Judge Kane also held that the contracts were ambiguous as to the applicable price upon deregulation, and that the intent of the parties on that issue would have to be determined at trial. R. Vol. I at Tab 13.

The case was reassigned to the Honorable Richard P. Matsch on April 26, 1988. He ruled on renewed motions for summary judgment on May 24, 1989, and reaffirmed Judge Kane's ruling regarding the unavailability of any market out right for Williams. He also held, however, that the contract was not ambiguous as to price, rather, it contained an open price term upon deregulation, and held that a reasonable price under U.C.C. § 2–305, Colo.Rev. Stat. § 4–2–305 (1973), would be determined at trial. R. Vol. II at Tab 25.

The case was again reassigned in December of 1989 to the Honorable Edward W. Nottingham, who tried the matter on February 5–9, 1990. On the first day of trial, Judge Nottingham (hereinafter "the district court") returned to Judge Kane's original position regarding the issue of price upon deregulation and ruled that parol evidence of the parties' intent could come in on that issue. At the conclusion of trial, the court entered judgment on behalf of the defendants-appellees.

The district court found that during the period in which the contracts were negotiated and signed, there was a shortage of natural gas and Williams was aggressively pursuing long-term sources of supply for its pipeline system. Williams was competing with other potential purchasers in a market characterized by rising prices. Williams needed the long-term contracts to supply its customers needs. Moreover, Williams had an additional incentive to se-

cure sources of gas in Yuma County, Colorado. The Federal Energy Regulatory Commission ("FERC") had placed a "through-put condition" on Williams's pipeline servicing that area. If Williams failed to fill the pipeline to a certain percentage of its capacity, its shareholders would have to absorb fixed costs that it otherwise could pass on to its customer users. The court found that the effects of the competitive market and Williams's special needs were manifest in the contracts' pricing provision, which secured favorable terms for the seller-producers (appellees). R. Vol. IX at 8–9.

The district court upheld the earlier rulings rejecting Williams's claimed right to market out of the contracts absent a seller request for price redetermination. The court also held that, absent such a request, the parties intended the last regulated price to continue as the contract price upon deregulation.

## DISCUSSION

### I.

██ Williams first contends that the district court erred by partially vacating, as to deregulated price, the summary judgment order entered by Judge Matsch. Williams asserts that the order was not "effectively vacated" until after the trial, "thereby prejudicing Appellant's preparation for, and conduct of, the trial in the district court." Brief of Appellant at 2.

We reject the proffered factual basis for this assertion. Careful scrutiny of the record reveals Williams had ample notice *before* the trial began that Judge Matsch's order no longer governed the proceedings. Judge Matsch himself apparently revised his ruling on October 13, 1989. In speaking to Williams's counsel, Judge Matsch said:

> Well, I—it seems to me what we're walking into then is the whole issue that I thought was not going to be necessary, and that is what these parties intended, and that's what defendants were arguing about the last time out, that we can't just do this on the basis of the Uniform Com-

mercial Code open price provision. So I guess that's the kind of trial we're going to have.

\* \* \* \* \* \*

[W]hatever [the parties] intended they didn't write, apparently, because your version of what they intended is not in the contract. The defendant's version of what they intended is not in the contract. So I guess if we had an outside law firm involved we'd have a lawsuit against them, too, but I don't see any way to get around this mess without just saying, "Okay, the trial's open to the issue of negotiations and the difference between what the expressed intent was in the negotiations or intents were in the contract as it was written," which is consistent with the defendants saying that there never was—well, reformation, I guess, because the language of the contract doesn't express the mutual intent. I don't know how else we do it but just set it for trial and let it all hang out, and that's what we'll do.

R. Vol. III at 7–8.[5]

Thus, it appears that Judge Matsch returned to Judge Kane's position that the court would consider evidence with regard to the intent of the parties concerning the appropriate price upon deregulation. At any rate, the district court clearly informed Williams this was the case at the *beginning*, not the end, of trial. In the opening minutes of the first day of the trial, while ruling on several motions in limine, the court explained:

> Judge Matsch in May, of course, construed the contract as being silent on the pricing provisions and therefore took the view that he would set a price under the

Uniform Commercial Code gap-filler provisions. The defendants argue that Judge Matsch reconsidered that and it looks like he might have. At any rate, I don't need to decide that because I've looked at the May 24th order, and I don't agree with Judge Matsch, and so we're going to conduct the trial in the following manner:

> It seems to me when there is no provision as to contract price, one of two inferences can be drawn. The first inference is that the parties did not intend the matter to be integrated and you can therefore supplement that inference with custom, usage, trade practice, and so forth. The second inference is that the parties did intend a complete integration of the contract on this point and therefore, because there's silence, you have to go to the UCC gap-filler provisions. It appears to me that Judge Matsch was concluding the second, was drawing the second inference; namely that there was silence, there was no ambiguity, and therefore he went to the gap, or he was going to the gap-filler provisions.

> I think that's—I don't agree with that. I think that the evidence before the Court at that time was unclear as to whether there was a complete integration on the point, and I mean, that evidence can come out at trial here. At any rate, Judge Matsch may have reconsidered. If he didn't reconsider, I'll now reconsider and we'll get into that evidence.

R. Vol. V at 6–7.

This announcement clearly put Williams on notice that Judge Matsch's May 1989 order regarding UCC gap-fillers no longer governed the proceedings.[6] Williams did

---

5. Williams argues that this discussion refers solely to the defendants' reformation counterclaim. The evidence admissible to demonstrate reformation, argues Williams, is significantly different from the general intent evidence that was admitted at trial, and Williams would have submitted a great deal more evidence of the parties' intent had it known the legal issue went beyond reformation.

After carefully reviewing the record, we are not convinced that Williams was, as it claims, holding back any significant evidence of intent. Whatever the perceived legal rubric, Williams

vigorously tried the issue of the parties' intent regarding contract price upon deregulation. As a result, even if we were to conclude that the district court had erred, we could not say that Williams was prejudiced.

6. In its brief, Williams asserts that the district court specifically stated that it would not reverse the earlier summary judgment order of Judge Matsch. *See* Appellants Brief at 17–18; R. Vol. IX at 10–11. Review of the passage reveals, however, that the district court was referring to the portion of Judge Matsch's ruling

not object or move for a continuance, or even seek reconsideration. Instead, Williams simply opted to proceed as if the May 24 order were still valid.[7] Williams is solely responsible for any prejudice resulting from this strategy, and cannot now claim that it received insufficient notice that the May 1989 order was vacated.

■ We cannot agree with Williams's contention that the district court's action violated any law of the case. *See Gage v. General Motors Corp.*, 796 F.2d 345, 349 (10th Cir.1986) ("The law of the case rule applies only when there has been a final decision."); *Lindsey v. Dayton–Hudson Corp.*, 592 F.2d 1118, 1121 (10th Cir.) ("Until final decree the court always retains jurisdiction to modify or rescind a prior interlocutory order."), *cert. denied*, 444 U.S. 856, 100 S.Ct. 116, 62 L.Ed.2d 75 (1979). Nor do we find that the court abused its discretion in this regard.

## II.

Williams next asserts that the district court erred in considering parol evidence of the parties' intent regarding contract price upon deregulation. In admitting the parol evidence, the district court found that the contracts were not integrated agreements and that they were also ambiguous. We consider each of these independent rationales in turn.

*Integration*

Colorado has adopted section 2–202 of the UCC, which provides:

**4–2–202. Final written expression— parol or extrinsic evidence.** Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein, may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

(a) By course of dealing or usage of trade (section 4–1–205) or by course of performance (section 4–2–208); and

(b) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Colo.Rev.Stat. § 4-2-202 (1973).

The district court found that the contracts were not intended as a complete and exclusive statement of the terms of the agreement. Consequently, the court admitted, under subsection (b), extrinsic evidence of a "consistent additional term," namely, the agreed-upon price for deregulated gas. R. Vol. IX at 19–20, 39.

■ The parties dispute the appropriate standard of review. While integration may be viewed as a question of law, *Universal Drilling Co. v. Camay Drilling Co.*, 737 F.2d 869, 871 (10th Cir.1984), it is more commonly characterized as a question of fact. *Firestone Tire & Rubber Co. v. Pearson*, 769 F.2d 1471, 1477 (10th Cir. 1985); *Transamerica Oil Corp. v. Lynes, Inc.*, 723 F.2d 758, 763 (10th Cir.1983) (citing 2 R. Anderson, *Uniform Commercial Code* 154–155 (3d ed. 1982) and 3 A. Corbin, *Corbin on Contracts* § 595 (1960)). In this case, the integration determination certainly was a predominantly factual inquiry, revolving around the unwritten intentions of the parties instead of interpretation of a formal integration clause. *Cf. Ray Martin Painting, Inc. v. Ameron Inc.*, 638 F.Supp. 768, 773 (D.Kan.1986). We do not disturb a district court's findings of fact unless they are clearly erroneous. Fed.R.Civ.P. 52(a); *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

that dealt with Williams's asserted right to market out of the contracts. The passage indicates that both Judges Kane and Matsch held that Williams had not satisfied the precondition for marketing out of the contracts and that the district court agreed with the earlier holdings. As stated above, the district court had already informed the parties that it was vacating Judge Matsch's order regarding the parties' intentions on deregulated price.

7. In opening argument, Williams essentially argued that Judge Matsch's order had not been vacated. R. Vol. V at 22–23.

■ Williams asserts that the district court improperly "presumed" that the contracts were not integrated. *See* R. Vol. IX at 19–20. We disagree. The district court specifically reviewed the evidence and held that it did not support a finding of integration. The court's reference to § 2–202's "presumption" [8] is nothing more than a paraphrase of precedent from this circuit: "under section 2–202, there is no longer an assumption that the parties intended a writing to be the complete expression of their agreement. In fact, the assumption is to the contrary unless the court expressly finds that the parties intended the contract to be completely integrated." *Amoco Production Co. v. Western Slope Gas Co.*, 754 F.2d 303, 308 (10th Cir.1985). Here, the district court expressly found that the parties did not intend the contract to be completely integrated. After carefully reviewing the evidence before the district court, we cannot say that its finding was clearly erroneous.[9]

### Ambiguity

■ Even if we were to find that the contracts were integrated agreements, we would still affirm the district court's use of extrinsic evidence to determine the parties' intentions regarding contract price upon deregulation. The district court alternatively held that the pricing provision in the contracts is ambiguous as to price upon deregulation. "Parol evidence is inadmissible to vary or contradict the terms of an unambiguous agreement, *but where uncertainty exists such evidence may be received to explain the contract.*" *Montoya v. Cherry Creek Dodge, Inc.*, 708 P.2d 491, 492 (Colo.Ct.App.1985) (emphasis added); *see also Amoco Prod. Co. v. Western Slope Gas Co.*, 754 F.2d at 308 ("Only if in light of the circumstances and purposes of the contract the judge finds it unambiguous should he or she prohibit parol evidence to explain its meaning."). The ambiguity of a contract provision is an issue of law, *Teton Exploration Drilling, Inc. v. Bokum Resources Corp.*, 818 F.2d 1521, 1526 (10th Cir.1987); *Devine v. Ladd Petroleum Corp.*, 805 F.2d 348, 349 (10th Cir.1986), and we find no legal error in the district court's conclusion.

We are not persuaded by Williams's assertion that the district court erred in this regard because the pricing provision is merely "silent," not ambiguous, as to the applicable price upon deregulation. First, the provision is not "silent" as to deregulation price. Section 3 addresses price in considerable detail, and subsection (d) ex-

8. The court stated:

> [T]he presumption under Section 4–2–202 is that the contract is not an integrated contract because evidence of consistent additional terms can be admitted unless the Court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

R. Vol. IX at 20.

9. Williams asserts that Judge Kane held the contracts were integrated. Scrutiny of Judge Kane's order reveals that he ruled separately on two distinct issues. While he did hold that the contracts were "integrated" as to Williams's right to market out of the agreements, he also explicitly held that "the contract's construction on the applicable price [at deregulation] depends on extrinsic facts and circumstances...." R. Vol. I, Tab 13 at 4.

Williams similarly cites for support to several documents filed by the Lockridge Group early in the litigation: a memorandum in support of a motion to strike, and the affidavit of John P. Lockridge. R. Supp. Vol. I. In the memorandum, the Lockridge Group argued at length that the contracts were integrated. In the affidavit, John Lockridge testified:

> 23. The written agreements were intended to reflect the entirety of the agreement between Northwest Central [Williams] and the Sellers. For that reason extensive details were included in the contracts in addition to the major operative terms such as the pricing provisions, take obligations, quality specifications, *etc.*

R. Supp. Vol. I, Exhibit A–1 at 6.

Although these documents give us pause, and present a close case, we do not consider them sufficient to render the district court's ruling on integration clearly erroneous. First, the apparent admissions are those of only the Lockridge Group, not JER or Yuma. Moreover, John Lockridge revised his testimony at trial and stated that the contracts were only the entire *written* agreement between the parties. R. Vol. VIII at 676. It is certainly possible that the district court placed more emphasis on this courtroom testimony. Williams did not impeach Mr. Lockridge with his prior, apparently inconsistent statement.

plicitly discusses the effects of deregulation. It provides, in part:

(d) In the event the regulation of the price at which natural gas is sold ceases in whole or in part, or is modified, so as to allow for the sale of gas hereunder at redetermined prices, then Seller shall have the right to request a redetermination of the price at which natural gas is to be sold hereunder.

R. Vol. I, Tab 21 at Exhibits A, B, C, D, E, F and G.

A perfectly reasonable interpretation of this language (which the district court ultimately adopted) is that *nothing* happens to the contract price upon deregulation *unless* the seller requests redetermination. Otherwise, the seller's redetermination right would be rendered meaningless. Ambiguity arises because Williams makes the more attenuated claim that, because this language does not explicitly state that the deregulation price will be the last regulated price (if the seller does not request redetermination), it creates an open price term upon deregulation. Thus, the ambiguity concerns the appropriate inference to be drawn from 3(d)'s language; two rational, but mutually exclusive, choices are available. The contract may not be explicit, but it certainly is not silent.

Second, to the extent that the pricing provision is not explicit in answering the interpretive question at issue, we cannot find in Colorado law the rigid ban Williams has described preventing admission of parol evidence to explain this sort of ambiguity. Instead, the Colorado courts have held that "where ambiguity exists, parol evidence is admissible to *explain or supplement* the terms of the contract." *Hott v. Tillotson–Lewis Constr. Co.*, 682 P.2d 1220, 1223 (Colo.Ct.App.1983) (emphasis added). Indeed, the case Williams cites to support its proposition fails to do so. In *Regents of Univ. of Colo. v. K.D.I. Precision Products, Inc.*, 488 F.2d 261, 267 (10th Cir.1973), we held

The absence from the contract of such language [concerning ownership of the equipment] does not, as KDI asserts,

make for ambiguity, but rather the opposite.

\* \* \* \* \* \*

It was the conclusion of the trial court that the contract under consideration being silent, either by apt word or necessary implication, as to the ownership of the equipment, was clear and unambiguous on its face and conferred no rights to the laboratory equipment or machines to [KDI]. We agree.

Here, however, as discussed above, the contracts arguably contain the sort of "necessary implication" missing from the contract in that case.

In short, we refuse to legally preclude the sort of ambiguity created by conflicting inferences that can be drawn from incomplete contract language. Since the pricing provision's language is susceptible of more than one reasonable interpretation, *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374–75 (Colo.1990), we agree with the district court that it is ambiguous.

We therefore affirm, on independent rationales, the district court's decision to admit extrinsic evidence of the parties' intentions regarding the applicable contract price upon deregulation.

### III.

Finally, Williams asserts that the district court's decision "does not comport with the plain language of the contracts and establishes an illegal contract price." Brief of Appellant at 37. From the outset, this case has presented two main issues: 1) whether Williams possesses a right to unilaterally terminate the contracts, and 2) what the appropriate contract price is upon deregulation of the natural gas industry. We review each in turn.

*Termination*

The district court, adhering to the two previous summary judgment holdings, R. Vol. I, Tab 13 at 2–4; R. Vol. I, Tab 25 at 3, held that a necessary precondition to Williams's right to market out—a Seller request for price redetermination—had not been fulfilled, and held that Williams therefore had no right, under the contracts, to

terminate the agreements. We review this legal conclusion *de novo*.

The relevant contract language provides: If at any time Buyer determines in its sole judgment that it is uneconomical to continue to purchase Seller's gas at the price established in this Paragraph (d), the Buyer may terminate this Contract upon thirty (30) days written notice to Seller....

R. Vol. I, Tab 21 at Exhibits. In clear terms, the termination right only applies to "the price established in Paragraph [3(d)]." A new contract price is "established" under paragraph 3(d) *if* the seller requests redetermination. No seller has. The contract precondition to Williams's termination right has not been satisfied. Moreover, we agree with the district court that Williams's claim to a broad, unilateral right to market out is inconsistent with Williams's concession to a seller-only right to redetermination. The seller-only redetermination right would be meaningless if, whenever a seller chose to retain the current price by not requesting redetermination, Williams could nevertheless unilaterally terminate the contract. As a matter of contract construction, we find no legal error in the district court's analysis. We affirm the district court's holding that, in the absence of a redetermination, the market out language does not provide Williams with a right to terminate the contracts in this case.

*Deregulated Price*

In deciding the issue of applicable price, the district court resorted to extrinsic evidence of the parties' intent. "If a contract's construction depends upon extrinsic facts and circumstances, then its terms become questions of fact." *Amoco Production Co. v. Western Slope Gas Co.*, 754 F.2d at 309; *see also City of Farmington v. Amoco Gas Co.*, 777 F.2d 554, 560 (10th Cir.1985). We therefore will only overturn the district court's construction of the contract's price provision if it is clearly errone-

ous, i.e., "if our review of the record leaves us with a definite and firm conviction that a mistake has been made." *Amoco Production Co. v. Western Slope Gas Co.*, 754 F.2d at 309 (citing *Dowell v. United States*, 553 F.2d 1233, 1235 (10th Cir.1977)).

The district court found that, in the absence of a seller request for redetermination, the parties intended the last regulated price to be the contract price upon deregulation. Overwhelming evidence supported this conclusion. Indeed, Williams's witnesses uniformly agreed that this was the parties' intention. R. Vol. IX at 37.[10] We cannot say that this finding was clearly erroneous.

Williams argues that the district court's construction of the contracts is "internally inconsistent."

Under the proper analysis, either the contracts contain no deregulated price—in which case the contracts fail for lack of mutual assent or the trial court should have determined a reasonable price under UCC § 2–305—or paragraph 3(d) of the contracts does provide a deregulated price and [Williams] has the right to market out of the contracts.

Brief of Appellant at 38. Williams's argument is based on the premise that any deregulated price has to be "established" under subparagraph 3(d). Williams emphasizes paragraph 3's introductory language: "Buyer shall pay Seller ... *the applicable one* of the following prices...." According to Williams, the parties intended the subparagraphs to apply in the alternative. Since (d) is the only subparagraph that explicitly mentions deregulation, either it establishes the deregulated price, or there is no deregulated price and the trial court should have determined a reasonable price under the UCC to fill the open price term.

The district court specifically considered and rejected Williams's argument concerning "the applicable one." In fact, the district court's finding of ambiguity as to deregulated price was based, in large part, on

---

**10.** Williams's witnesses qualified this testimony with their belief that Williams had the right to market out of this price. The district court found, however, that this belief was never communicated to appellees, R. Vol. IX at 37; and, as discussed above, the district court rejected the existence of any such termination right as a matter of law.

its attempt meaningfully to apply the phrase, "the applicable one," in the manner Williams suggests. The district court could not. Neither can we. The structure and language of the subparagraphs defy Williams's interpretation. First, at least one subparagraph is clearly conjunctive.[11] Since subparagraph (f) applies to every pricing scheme, there are, at a minimum, always two "applicable" subparagraphs. Second, the subparagraphs cross-reference each other. Subparagraph (c) references (d), and subparagraph (e) references (a), (b), (c) and (d). Thus, by their own terms, the subparagraphs may "apply" simultaneously.

It was this interaction of the subparagraphs that the district court found particularly confusing. R. Vol. IX at 21. We have already upheld the court's decision to admit extrinsic evidence on this issue, and, unlike the poorly drafted contract, the parol evidence was crystal clear: the parties intended the last regulated price to be the deregulated price unless the seller requested price redetermination. After reviewing the evidence in its entirety, we cannot say that this finding by the district court was clearly erroneous.

■ We reject Williams's attenuated argument that the district court's decision somehow violated federal law by impermissibly basing the contract price for "tight sands" gas on a provision (3(c)) that did not satisfy FERC's requirement to "specifically reference[ ] the incentive pricing authority of the Commission under section 107 of the NGPA." 18 C.F.R. § 271.702(a)(1) (1989) (codifying Order No. 99, 45 Fed.Reg. 56034 (1980), aff'd Pennzoil v. FERC, 671 F.2d 119 (5th Cir.1982)). Williams's argument is premised on its interpretation of "the applicable one" and its assertion that the district court based its holding solely on an application of subparagraph 3(c). Williams misses the mark on both counts. We reject Williams's interpretation of "the applicable one." Moreover, the district court specifi-

cally held, and we agree, that the last regulated contract price was established pursuant to *both* subparagraphs (c) and (e). *See* R. Vol. IX at 35.

## IV.

■ JER and Yuma cross appeal, challenging the district court's award of prejudgment interest at the statutory rate of eight percent, rather than at a higher rate which appellants sought. The relevant Colorado statute allows the court to award interest in "an amount which fully recognizes the gain or benefit realized by the person withholding such money or property," Colo.Rev.Stat. § 5–12–102(1)(a) (Supp. 1990), or at a default rate of eight percent, *id.* at § 5–12–102(1)(b). In interpreting this provision, we have held that, in order to receive the higher interest rate, the claimant must specifically prove that the withholding party actually benefited in a greater amount. *Lowell Staats Mining Co. v. Pioneer Uravan, Inc.,* 878 F.2d 1259, 1270–71 (10th Cir.1989).

The district court found that the evidence did not show Williams "benefited to a rate greater than 8 per cent by virtue of withholding this money." R. Vol. IX at 43. Upon reviewing the evidence, we cannot say that its finding was clearly erroneous. *See Davis Cattle Co. v. Great Western Sugar Co.,* 544 F.2d 436, 442 (10th Cir. 1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977).

Accordingly, we AFFIRM in all respects, the holding of the district court.

11. Paragraph 3(f) states, in part:
    (f) In addition to the other pricing provisions of this Section 3, Buyer agrees to compensate Seller for production-related costs. . . .

The Lockridge Contract, R. Vol. I, Tab 21 at Exhibit G.