**Joseph A. MULLAN, an individual, Plaintiff-Appellee,**

v.

**QUICKIE AIRCRAFT CORPORATION, a California corporation, Defendant-Appellant.**

No. 85–1107.

United States Court of Appeals, Tenth Circuit.

July 21, 1986.

Bruce A. Lampert, of Schaden & Heldman, Denver, Colo., for plaintiff-appellee.

Franklin D. Patterson (Glenn T. Kray with him on briefs), of DeMoulin, Anderson, Campbell & Laugesen, Denver, Colo., for defendant-appellant.

Before BARRETT, ANDERSON, and TACHA, Circuit Judges.

BARRETT, Circuit Judge.

Appellant, defendant below, Quickie Aircraft Corporation (Quickie), appeals from the denial of its motion for Judgment Notwithstanding the Verdict or in the Alternative for Remittitur or New Trial by the District Court for the District of Colorado. Quickie's motion was filed after the entry of judgment in favor of plaintiff-appellee, Joseph A. Mullan (Mullan), based on a jury verdict in the amount of $155,000. Quickie raises four issues on appeal: (1) whether the district court erred in refusing to instruct the jury on negligence per se; (2) whether the district court erred in denying Quickie's motion for directed verdict on Mullan's breach of warranty claim; (3) whether the district court erred in allowing Mullan's expert witness to testify based on National Transportation Safety Board reports; and (4) whether the district court erred in striking as unconscionable the disclaimer provision contained in the sales contract between the parties?

On August 31, 1980, Mullan, a Colorado resident, was injured when his home-built aircraft crashed on take-off from the Loveland-Fort Collins, Colorado, airport. Quickie, a California corporation, was the manufacturer and distributor of the kit from

which Mullan constructed the aircraft. Mullan filed this diversity action for personal injuries sustained in the airplane crash on March 20, 1981. Judgment was entered in favor of Mullan on November 1, 1984, and Quickie's post-trial motions were denied on December 18, 1984. A notice of appeal was filed on January 17, 1985, invoking this court's jurisdiction pursuant to 28 U.S.C. § 1291.

### I.

Quickie contends that the district court erred as a matter of law in refusing to instruct the jury on negligence *per se.* One of Quickie's defenses was that Mullan was negligent as a matter of law because he violated certain aviation regulations (FARs). Quickie advances several arguments to support its contention that the district court erred in refusing its tendered negligence *per se* instruction.

■ Assuming, without deciding, that the district court did err in refusing Quickie's proposed negligence *per se* instruction, we hold that this error is not reversible. Quickie concedes the district court permitted it to argue during trial that Mullan had violated the FARs in flying his aircraft. (Appellant's Brief, p. 13.) The jury did in fact find Mullan 10% at fault under Colorado's comparative negligence statute. (R.Vol. I, p. 138.) While a negligence *per se* instruction establishes that a party is negligent as a matter of law, *Reed v. Barlow,* 153 Colo. 451, 386 P.2d 979 (1963), under Colorado's comparative negligence statute, C.R.S. 13–21–111, the finder of fact must nonetheless apportion the parties' relative fault. *McCormick v. United States,* 539 F.Supp. 1179, 1182 (D.Colo.1982).

■ We do not believe Quickie was harmed in any material way by the district court's refusal to instruct the jury on negligence *per se.* Quickie had an opportunity to argue before the jury Mullan's alleged violation of FARs. The jury found that Mullan was negligent. Under these circumstances, we hold that no reversible error was committed even assuming that the district court erred in refusing to tender the negligence *per se* instruction.

### II.

Quickie contends that the district court erred as a matter of law in denying its motion for directed verdict on Mullan's breach of express warranty claim. Quickie contends that it was entitled to a directed verdict as a matter of law because Mullan failed to introduce evidence at trial that he notified Quickie pursuant to C.R.S. 4–2–607(3)(a)[1] regarding Quickie's breach of warranty.

■ In reviewing the denial of a motion for directed verdict, we view the evidence and the inferences from it in "the light most favorable to the parties for whom the jury found. A directed verdict ... may not be granted unless the evidence points but one way and is susceptible to no reasonable inferences which may sustain the position of the party against whom the motion is made." *Miller v. City of Mission, Kan.,* 705 F.2d 368, 373 (10th Cir.1983) (citations omitted). After entertaining Quickie's argument on the motion for directed verdict, the district court ruled that Mullan's testimony was sufficient to permit the issue of notice to go to the jury. (R.Vol. IX, p. 97.) The jury was instructed that as an element of Mullan's breach of warranty claim, the jury had to find by preponderance of the evidence that Mullan notified Quickie of the accident within a reasonable time after it occurred. (R.Vol. I, p. 116, para. 6.) The jury found Quickie liable on the breach of warranty claim. (R.Vol. I, p. 138.) Under these circumstances, we hold that the district court did not err in denying Quickie's motion for directed verdict on Mullan's breach of warranty claim.

---

1. (3) Where a tender has been accepted:
   (a) The buyer must within a reasonable time after he discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy....

## III.

■ Quickie contends that the district court erred as a matter of law in allowing Mullan's expert witness, Donald Sommer, to testify based in part on his review of National Transportation Safety Board (NTSB) reports. Quickie relies on 49 U.S.C. § 1441(e)[2] as a bar to the use of the NTSB reports in this case.

Mullan contends that section 1441(e) has been construed to permit the use of factual portions of NTSB reports, and only the use of those portions of the reports regarding proximate cause of the crash is prohibited. In *Keen v. Detroit Diesel Allison*, 569 F.2d 547, 549–51 (10th Cir.1978), we cited with approval the opinions of those courts which have construed section 1441(e) to exclude only the parts of NTSB reports which contain agency conclusions on the probable cause of accidents. The Colorado Court of Appeals has also adopted this construction of section 1441(e). *Murphy v. Colorado Aviation, Inc.*, 41 Colo.App. 237, 588 P.2d 877 (1978).

Our review of the record reveals that Mullan's expert witness properly relied on the factual portions of the NTSB report. To hold, as Quickie's argument suggests, that Sommer impermissibly relied on the NTSB report because his conclusions were the same as or similar to those of the NTSB investigators, is an inference which we shall not make. Therefore, we hold that the district court did not err in permitting Sommer's testimony.

## IV.

Quickie contends that the district court erred in striking the disclaimer language from the sales contract and other documents as unconscionable pursuant to C.R.S. 4–2–719(3).[3] Quickie argues that C.R.S. 4–2–719(3) makes contract provi-sions which waive consequential damages for personal injuries *prima facie* unconscionable, and the district court erred as a matter of law by improperly evaluating the evidence presented to rebut the presumption.

In its answer to Mullan's amended complaint, Quickie raised an affirmative defense that Mullan had contractually waived his rights to assert any claim against Quickie arising from structural integrity, performance, flight characteristics, mechanical failure, and safety. (R.Vol. I, p. 20 para. 22.) Quickie based its affirmative defense on language contained in the sales contract and in other exhibits such as the owner's manual which provided as follows:

QUICKIE AIRCRAFT CORPORATION is not responsible, and makes no warranties, express or implied whatsoever, regarding the structural integrity, performance, flight characteristics, or safety of the buyer's completed aircraft and its component parts. QUICKIE AIRCRAFT CORPORATION has no control and assumes no control of the buyer's ability to successfully construct and test the QUICKIE AIRCRAFT. *Buyer expressly waives any and all claims arising from structural integrity, performance, flight characteristics, mechanical failures, and safety against QUICKIE AIRCRAFT CORPORATION.* Buyer acknowledges awareness of the risks of flying a home built aircraft. Buyer acknowledges that the FAA must inspect the aircraft at construction intervals, as well as the completed project, prior to flight and should work with his local FAA representative regarding the construction and licensing of the aircraft.

(R. Defendant's Exhibit H (emphasis added).)

---

**2.** "No part of any report or reports of the National Transportation Safety Board relating to any accident or the investigation thereof, shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report or reports."

**3.** C.R.S. 4–2–719(3) provides as follows:

Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable, but limitation of damages where the loss is commercial is not.

During the presentation of plaintiff's case, the court made a preliminary ruling that only the emphasized sentence of the above-quoted paragraph need be deleted from the exhibits as unconscionable. On October 23, 1984, during the presentation of defendant's case, the court held a hearing out of the presence of the jury, on, among other things, Quickie's disclaimer provision. Relying on evidence admitted at trial, including Mullan's testimony, defense counsel summarized his argument on the conscionability of the disclaimer provision as follows:

> I don't feel that Mr. Mullan was in an unequal bargaining position to negotiate through this great and unconscionable type of contract. He certainly had previous discussion with the defendant, he read all of the literature. In addition to the sales literature, he read the articles in sports magazines written by expert fliers and by engineers. He entered into the sales agreement with the defendant. He apparently had some discussion with the defendant. At least if he didn't he made enough changes to the contract. It's only a one-page contract and yet he made, oh, I think four to six changes on the one page; and then he and his partner added a whole paragraph on a second page, so they certainly read the contract and felt that they could vary the terms of the contract if they needed to. So I don't see any one-sidedness, any oppression or unfair surprise as brought out in some of the Colorado cases....
>
> Also, this plaintiff testified that he looked into a couple of other types of aircraft kits. He could have bought another type of aircraft kit, if he felt that he couldn't live with the disclaimer of any express warranties in this case; and as a matter of fact, he testified that later

on he did buy a different type of aircraft kit and there were others available, so it wasn't the kind of thing where he had no choice but to buy a Quickie Aircraft kit, and there is no evidence that this contract was such that it was confusing or that any of the language was contradictory.

> In the sales agreement, it's a very, very brief sales agreement. In fact, I would say almost half of the sales agreement deals with the statements that there are no express warranties.

(R.Vol. IX, pp. 763–65.) Following counsel's arguments, the district court reaffirmed the preliminary ruling that the waiver language was unconscionable:

> My ruling on all of these exhibits is that the sentence which reads, "Buyer expressly waives any and all claims arising from structural integrity, performance, flight characteristics, mechanical failures, and safety, against Quickie Aircraft corporation," must be stricken by the Court because of the Colorado statute, which is C.R.S. 4–2–719, which indicates that limitation of consequential damages for injury to the person in the case of consumer goods—and it appears to me that this plane is a consumer good—is prima facie unconscionable. And I have not been convinced that that statute should not be enforced.

(R.Vol. IX, p. 766.)

C.R.S. 4–2–302 [4] sets forth the relevant law regarding unconscionability under the Colorado Uniform Commercial Code. Official comment 3 to section 4–2–302 makes it clear that a finding of unconscionability is to be made by the court and not by the jury. Therefore, the finding of unconscionability is a question of law. *Delhomme Industries, Inc. v. Houston Beech-*

---

4. C.R.S. 4–2–302 provides as follows:

**Unconscionable contract or clause.**
(1) If the court, as a matter of law, finds the contract or any clause of the contract to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect, to aid the court in making the determination.

*craft, Inc.*, 669 F.2d 1049, 1063 (5th Cir. 1982); *County Asphalt, Inc. v. Lewis Welding & Engineering Corp.*, 444 F.2d 372 (2d Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971); *Smith v. Price's Creameries Div. of Creamland Dairies, Inc.*, 98 N.M. 541, 650 P.2d 825 (1982).

■ Although the finding of unconscionability is a question of law, when a finding on a question of law is made by the district court upon the presentation of evidence, the finding becomes properly a mixed question of law and fact. We have said that a mixed question of law and fact arises " 'when the facts are admitted or established and the law is undisputed,' and the issue is only whether the facts must meet the statutory standard. If what must be decided in the mixed question involves primarily a consideration of legal principles, then the appellate court reviews *de novo.*" *Allis-Chalmers Credit Corp., et al. v. Tri-State Equipment, Inc., et al,* 792 F.2d 967, 970 (10th Cir.1986). While the finding of unconscionability involves primarily a consideration of legal principles and policies, a finding of unconscionability is one under state law. In reviewing the interpretation and application of state law by a resident federal judge sitting in a diversity action, we are governed by the clearly erroneous standard. *King v. Horizon Corp.*, 701 F.2d 1313, 1314 (10th Cir. 1983). Under the clearly erroneous standard, reversal is required only if our review of the record leaves us with a definite and firm conviction that a mistake has been made. *Amoco Production Co. v. Western Slope Gas Co.*, 754 F.2d 303, 309 (10th Cir.1985).

■ We begin our analysis of the unconscionability of the Quickie disclaimer provision by noting that the Colorado Uniform Commercial Code does not define the term "unconscionable."[5] However, C.R.S. 4-1-103 provides that "[u]nless displaced by the particular provisions of [the Uniform Commercial Code], the principles of law and equity ... shall supplement its provisions." Therefore, in determining whether Quickie's disclaimer provision is unconscionable, we look to the existing common law of Colorado.

■ In *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo.1986) (citation omitted), the Colorado Supreme Court summarized the standard for finding common law unconscionability:

> In order to support a finding of unconscionability, there must be evidence of some overreaching on the part of one of the parties such as that which results from inequality of bargaining power or under other circumstances in which there is an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to that party.

In *Davis*, the Colorado Supreme Court enumerated the factors which it found relevant to a finding of unconscionability: (1) a standardized agreement executed by parties of unequal bargaining strength; (2) a lack of opportunity to read or become familiar with the document before signing it; (3) use of fine print in the portion of the contract containing the provision; (4) absence of evidence that the provision was commercially reasonable or should have been reasonably anticipated; (5) the terms of the contract, including substantive unfairness; (6) the relationship of the parties, including factors of assent, unfair surprise and notice; and (7) all the circumstances surrounding the formation of the contract, including its commercial setting, purpose and effect.

We also find instructive the Colorado Supreme Court's discussion of contracts of adhesion, common law analogs to the Uni-

---

**5.** Official Comment 1 of C.R.S. 4-2-302 states that the basic test of whether a clause or contract is unconscionable is whether "in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.... The principle is one of the prevention of oppression and unfair surprise...." *See also, Trans-America Oil Corp. v. Lynes, Inc.,* 723 F.2d 758, 764 (10th Cir.1983).

form Commercial Code's principle of unconscionability. In *Jones v. Dressel*, 623 P.2d 370, 374 (Colo.1981) (citations omitted), the court defined an adhesion contract as one "drafted unilaterally by a business enterprise and enforced upon an unwilling and often unknowing public for services that cannot readily be obtained elsewhere. An adhesion contract is generally not bargained for but is imposed on the public for a necessary service on a take-it-or-leave-it basis." In *Jones v. Dressel*, the court adhered to an earlier ruling that even though a contract is a printed form and offered on a "take-it-or-leave-it basis," those facts alone do not cause it to be an adhesion contract. "There must be a showing 'that the parties were greatly disparate in bargaining power, that there was no opportunity for negotiation or that [the] services could not be obtained elsewhere.' " 623 P.2d at 374, quoting *Clinic Masters v. District Court*, 192 Colo. 120, 556 P.2d 473, 475–76 (1976).

In *Jones v. Dressel*, the court also considered the validity of exculpatory agreements which attempt to insulate a party from liability of his own negligence, such as the disclaimer provision in this case. In determining whether an exculpatory agreement is valid, the court identified four factors which must be considered: "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." *Id.* at 376.

Considering the factors identified by the Colorado Supreme Court regarding the doctrine of unconscionability, contracts of adhesion and the validity of exculpatory agreements, we hold that under the facts of this case the disclaimer provision of the Quickie sales agreement is a conscionable and valid exculpatory agreement. Mullan was an FAA certified pilot. (R.Vol. VI, p. 19). He was an expert woodmaker who made airplane propellers commercially. (*Id.* at 15–19.) In fact, Mullan knew Bert Rutan, a founder of the Quickie Aircraft Company, who tested Mullan's propellers and recommended them in an article published in Rutan's newsletter. (*Id.* at 18–19.) Mullan was a member of the Associates Flying Club (*id.* at 19) and of the Experimental Aircraft Association (EAA), (*id.* at 24).

Prior to purchasing a Quickie aircraft kit, Mullan attended Quickie presentations at an EAA convention in Oshkosh, Wisconsin. He also attended a presentation by another founder of Quickie Aircraft, Gene Sheehan, at an EAA meeting in Boulder, Colorado. (*Id.* at 25–26.) Mullan testified on direct examination that although he did not remember whether he asked any questions of Mr. Sheehan at the EAA meeting, "if I didn't ask a question personally that was of interest to me, it was because somebody else had already asked it." (*Id.* at 28.) Mr. Mullan testified at several points during direct and cross examination that he read everything he could get his hands on regarding the Quickie Aircraft. (*Id.* at 32, 89, 95, 97.) In addition, sometime after the crash, Mullan built a Dragonfly home-built aircraft which is similar to the Quickie aircraft. (*Id.* at 170.)

In addition to these facts, we find the sales agreement to be of particular significance.[6] The sales agreement consists of a

---

**6.** **SALES AGREEMENT**

QUICKIE AIRCRAFT CORPORATION sells to the undersigned, for the sum of $2,900.00, one QUICKIE AIRCRAFT kit, consisting of the following:

Complete plans to construct the QUICKIE AIRCRAFT, Quickie owners manual, one-year subscription to the Quickie Newsletter, wheels, tires, day-VFR instruments, cylinder head temperature gauge, tail spring, molded canopy, molded cowling, welded components, precision bearing holes drilled, and raw materials.

QUICKIE AIRCRAFT CORPORATION sells to the undersigned, for the sum of $1,050.00, one QUICKIE AIRCRAFT engine package, consisting of the following:

18 h.p. motor, electrical system with 15 amp alternator (less battery), machine cut wood propeller, exhaust system, and propeller extension with special vibration control counterbalance.

single-sided, one-page document from which a Quickie aircraft kit may be ordered. The sales agreement between Mullan and Quickie Aircraft Corporation, admitted in evidence as Defendant's Exhibit H, contained four modifications made by Mullan which were apparently honored by Quickie Aircraft. There is no fine print in the Agreement, and the Agreement contains no legalese or boiler plate language. While there was no testimony at trial that the disclaimer provision could have been modified or deleted from the contract by Mullan, there was also no evidence that Mullan sought to have the language modified or deleted.

Applying the factors which the Colorado Supreme Court found relevant to an unconscionability determination, we do not believe such a finding could properly be made here. Assuming, *arguendo*, that this standardized agreement was executed by parties of unequal bargaining strength, still there was no lack of opportunity to read or become familiar with the document before signing it, there was no use of fine print in the portion of the contract containing the disclaimer provision, and there was evidence that the provision should have been reasonably anticipated from the terms of the sales agreement itself. Mullan had at least an indirect relationship with two of the three principals of the Quickie Aircraft Corporation. Given Mullan's expertise with respect to airplanes, his ability with woodworking, his awareness of the recreational nature of a home-built aircraft, his thorough investigation of the Quickie aircraft prior to ordering it, his modification of the sales agreement, coupled with all of the circumstances surrounding the formation of the contract, we do not view the disclaimer provision as unconscionable.

We also hold that the disclaimer provision is a valid exculpatory agreement.

The motor supplied is a four-stroke, two cylinder opposed, air-cooled, 18 h.p. modified Onan industrial engine, modified by quickie aircraft corporation FOR AIRCRAFT USE. The Onan Company does not manufacture QUICKIE AIRCRAFT engines; QUICKIE AIRCRAFT CORPORATION obtains these engines and modifies them for aircraft use. Onan is not involved in the modification, testing, or installation of these engines in aircraft use.

Upon receipt of this order and purchase price, buyer will be notified of delivery date and sent a copy of this sales agreement. An estimated advance delivery date can be obtained by prior phone communication if desired. Buyer pays all shipping costs freight collect in addition to the purchase price.

At QUICKIE AIRCRAFT CORPORATION's sole option, QUICKIE AIRCRAFT CORPORATION may refund the full purchase price at any time to Buyer prior to shipping and will then be relieved of further obligation. Prices, terms, and conditions may be changed at any time prior to the acceptance of the full purchase price by QUICKIE AIRCRAFT CORPORATION. QUICKIE AIRCRAFT CORPORATION makes no warranty or representation as to the availability of the engines. Engines and accessories not ordered and paid for at the initial purchase may be subject to price increases if ordered at a later time.

The QUICKIE kit, properly constructed, will reproduce the successful original QUICKIE designed, made, and tested by QUICKIE AIRCRAFT CORPORATION. QUICKIE AIRCRAFT CORPORATION is not responsible, and makes no warranties, express or implied whatsoever, regarding the structural integrity, performance, flight characteristics, or safety of the Buyer's completed air craft and its component parts. QUICKIE AIRCRAFT CORPORATION has no control and assumes no control over the Buyer's ability to successfully construct and test the QUICKIE AIRCRAFT. Buyer expressly waives any and all claims arising from structural integrity, performance, flight characteristics, mechanical failures, and safety against QUICKIE AIRCRAFT CORPORATION. Buyer acknowledges awareness of the risks of flying a home built aircraft. Buyer acknowledges that the FAA must inspect the aircraft at construction intervals, as well as the completed project, prior to flight, and should work with his local FAA representative regarding the construction and licensing of the aircraft.

QUICKIE AIRCRAFT CORPORATION reserves the right to make recommended revisions in the plane and construction of the aircraft at any time without liability to QUICKIE AIRCRAFT CORPORATION, as such revisions or changes may be deemed advisable from time to time.

☐ Enclosed is $3,100.00 for one QUICKIE AIRCRAFT kit*.

☐ Enclosed is $4,150.00 for one QUICKIE AIRCRAFT kit and one QUICKIE ENGINE package*.

☐ Enclosed is $1,150.00 for one QUICKIE ENGINE package*.

☐ Enclosed is $440.00 for one QUICKIE ENGINE installation package*.

Quickie did not owe a duty to the public in the sense that the Colorado Supreme Court identified such a duty in *Jones v. Dressel, supra* at 376, quoting *Tunkl v. Regents of University of California,* 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963). The nature of the contract between Mullan and Quickie Aircraft Corporation is for the sale of unassembled goods, and Mullan had the opportunity to buy a similar package elsewhere. The contract was fairly entered into and the intention of the parties was expressed in clear and unambiguous language. Thus, the disclaimer provision is a conscionable and valid exculpatory agreement.

### V.

■ Mullan contends that even if the district court erred in striking the disclaimer provision of the sales agreement, such error is harmless because the jury found Quickie liable on the theories of negligence, product liability, and warranty, without specifying the award of damages on any one or more of the theories of liability. We agree that in this case that if one or more of the theories of liability are preserved, notwithstanding the disclaimer provision of the sales agreement, then the jury's verdict and the district court's judgment must stand.

Mullan further contends, however, that under Colorado law, a strict product liability claim may not be waived or disclaimed in an exculpatory agreement. The parties do not identify, nor does our research reveal any Colorado law regarding the waiver of a strict product liability claim. We have found some disagreement, however, among the courts generally regarding the ability of contracting parties to waive a strict product liability claim. Therefore, we remand the case to the district court with directions to certify a question to the Colorado Supreme Court regarding this issue. Following certification, the district court is directed to proceed consistent with this opinion in light of the supreme court's response.

REVERSED and REMANDED.