Robin **VERNON, Rory Patrick Durkin, Bryan Sandquist, and Ted Moore, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**QWEST COMMUNICATIONS INTERNATIONAL, INC., a Delaware corporation, Qwest Services Corporation, a Colorado corporation, Qwest Corporation, a Colorado corporation, Qwest Communications Corporation, a Delaware corporation, and Qwest Broadband Services, Inc., a Delaware corporation, Defendants.**

**Civil Action No. 09–cv–01840–RBJ–CBS.**

United States District Court,
D. Colorado.

Feb. 27, 2013.

Beth E. Terrell, Kimberlee L. Gunning, Toby James Marshall, Jennifer Rust Murray, Terrell Marshall Daudt & Willie, PLLC, Seattle, WA, Darby K. Kennedy, Jeffrey Allen Berens, Dyer & Berens, LLP, Denver, CO, Michael D. Lieder, Mehri & Skalet PLLC, Washington, DC, for Plaintiffs.

Peter John Korneffel, Jr., Timothy R. Beyer, Kathryn Reed Debord, Bryan Cave HRO, Zhonette M. Brown, Brownstein Hyatt Farber Schreck, LLP, Denver, CO, for Defendants.

## ORDER

R. BROOKE JACKSON, District Judge.

This matter comes before the Court on plaintiffs' objection to an order issued by United States Magistrate Judge Craig B. Shaffer granting defendants' renewed motion to compel arbitration and staying this matter pending further proceedings. For the reasons set forth herein, the Court denies the plaintiffs' objection and affirms the magistrate judge's recommendation.

### Facts

The plaintiffs are former customers of Qwest who signed up for its "Price for Life" program which was a minimum two-year contract under which subscribers were guaranteed a discounted rate for as long as they maintained their service without change. Travis Leo Affidavit [# 27] ¶ 16. Subscribers who terminated the program within the first two years were charged a $200 early cancellation fee. Customers who elected to take monthly service without a two-year commitment lost their promotional rate after one year and were subject to possible rate increases. *Id.*

The Price for Life program was subject to a set of terms and conditions set forth in a Subscriber Agreement. [# 27–2]. Paragraph 17 of the Subscriber Agreement, captioned "Dispute Resolution and Arbitration," contains two provisions of particular importance to the present case. First, any dispute or claim arising out of or relating to the services provided by Qwest must be resolved in arbitration or in small claims court. Second, the subscriber waived his or her right to pursue any claims on a class or consolidate basis or in a representative capacity. *Id.* at 13.

Customers could sign up for the Price for Life program over the phone or via the Internet. To sign up over the phone a customer would first speak to a customer

service representative. After selecting their Internet service package, customers were transferred to a voice recording that told them that they had selected a multi-year package that was governed by the terms and conditions of the Subscriber Agreement. The recording said that the terms and conditions were located at www.qwest.com/legal, and it indicated that customers could cancel within 30 days without any early termination charge. [# 27–3].

Customers who enrolled vi a the Internet had to click a box to confirm that they agreed to a set of terms and conditions. The text informed customers that the terms and conditions of service were contained in a Subscriber Agreement, and the box asked customers to review the terms, including an arbitration agreement and limits on Qwest's liability. Later in the checkout process the customers were informed that their Internet service was offered subject to the terms found at www.qwest.com/legal, again expressly including arbitration and limits on Qwest's liability. [# 27–4].

Customers who purchased the service were given an installation disc. After loading the disc, known as the Quickconnect Install CD, a window would appear on the users' computer screens notifying them that use of the service was subject to the terms of the Subscriber Agreement (referred to also as the "Qwest Agreement"), which could be found at www.qwest.com/legal, and which they should read. [# 27–5]. The window stated, in italicized and bold letters, that the Subscriber Agreement's terms included arbitration and limits on Qwest's liability. The text box also included the terms of a "license agreement" that did not contain an arbitration clause. [# 27–5]. However, it warned the consumer that if he or she clicked on the radio button labeled "I accept the terms of the license agreement," that would be an electronic signature that

acknowledged agreement that the Qwest Agreement contained the terms under which the service and equipment was provided, and that "you understand and agree to such terms (even if you don't read them)." *Id.* at 2.

Finally, after subscribing to the Price for Life program, customers received a welcome letter. [# 27–6]. The welcome letter asked that customers please review important information on the back of the letter about terms of service. There the letter stated:

> Your Qwest Broadband service and related products are offered under the High–Speed Internet Subscriber Agreement terms, which are located at www.qwest.com/legal/highspeedinternet subscriberagreement. Please review the terms, which include arbitration and limits on Qwest liability. If you do not agree, call Qwest to cancel your service within 30 days. Qwest updates the Subscriber Agreement from time to time and your continued use of the services constitutes your acceptance of any changes.

*Id.* at 3. Some of the plaintiffs do not remember receiving the welcome letter, but they do not dispute that they received it.

Plaintiffs are four individuals who terminated their participation in the Price for Life program within two years after enrolling in it. The specific facts of each of the four plaintiff's enrollment in the program are set forth in detail in Judge Shaffer's order (hereafter "Magistrate Judge Order") 857 F.Supp.2d 1135, 1146–48 (D.Colo.2012). Plaintiffs have been charged and have either paid or protested the payment of the $200 early cancellation fee.

Plaintiffs brought this action in the Western District of Washington in 2008 purporting to represent a multi-state class

of similarly situated consumers who were, in their view, subjected to an invalid $200 early termination fee. They have demanded a trial by jury. After some initial skirmishing in that court, including a ruling on a motion to dismiss, the court transferred the case to this district in August 2009.

Defendants, who had also filed a motion to compel in the Washington court, filed another motion to dismiss [# 25] and a motion to compel arbitration [# 26] in this Court. The motion to dismiss was denied by Judge Daniel as moot after plaintiffs' Third Amended Complaint was filed. [# 58]. The motion to compel arbitration was later stayed pending the United States Supreme Court's decision in *AT & T Mobility, LLC v. Concepcion*, and all pending motions were denied without prejudice. [# 110, # 121]. The Supreme Court issued its decision in that case on April 27, 2011. Defendants then filed a renewed motion to compel arbitration. [# 132]. After full briefing and argument, the magistrate judge granted that motion. Plaintiffs objected to portions of that order, and those objections have been fully briefed.

**Standard of Review**

Magistrate Judge Shaffer determined that the motion was non-dispositive. Plaintiffs disagree. They argue that a motion to compel arbitration is a dispositive motion, and therefore, that the magistrate judge's order must be deemed a report and recommendation and reviewed de novo. The law on this issue is not clear. Only one circuit court to my knowledge has addressed the issue. It held that a motion to compel arbitration is non-dispositive, because a district court retains jurisdiction to review the arbitration award. *PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10 (1st Cir.2010). District courts have come to varying conclusions on the matter. *See, e.g. Coxcom, Inc. v. Egghead Telecom,* No. 08–cv–698–TCK–PJC, 2009 WL 4016629, at *1 (N.D.Okla. Sept. 11, 2009) (magistrate judge noting that motions to compel are usually treated as dispositive and issuing a report and recommendation); *Chen–Oster v. Goldman Sachs & Co.,* 785 F.Supp.2d 394, 399 n. 1 (S.D.N.Y.2011) (holding that a motion to compel was non-dispositive); *Jackman v. Jackman,* No. 06–1329–MLB–DWB, 2006 WL 3792109 (D.Kan. Dec. 21, 2006) ("because an Article III judge will ultimately be required to confirm, modify, or vacate any arbitration award, the order to stay proceedings and compel arbitration is non-dispositive and is within the magistrate's authority").

■ In the absence of definitive law on point, I borrow from related principles. Whether an individual has agreed to arbitrate a dispute involves the application of principles of state contract law. The court's determinations of law during that process are reviewed de novo. *Hardin v. First Cash Financial Services, Inc.,* 465 F.3d 470, 475–76 (10th Cir.2006). Although the district court retains jurisdiction to review an arbitrator's decision, the scope of review is narrow. Plaintiffs here argue that the order compelling arbitration will, if affirmed, sound the death knell of this case. In the circumstances, I elect to assume that the motion was dispositive and to review the magistrate judge's decision de novo.

**Conclusions**

Plaintiffs contend that the only way, as a practical matter, that individual claims of the size involved here can be pursued is in a class action. Arbitration on a classwide basis is fundamentally at odds with the purposes of arbitration and the Federal Arbitration Act and, at least in the absence of mutual consent, it cannot be ordered. *See AT & T Mobility v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 1748, 179 L.Ed.2d 742 (2011). Accordingly, plaintiffs' ability to pursue their claims as a

class action in federal court turns on their ability to establish either that they did not agree to arbitrate; or that the arbitration clause at issue here is not enforceable; or that defendants have waived their right to enforce it.

Plaintiffs made all three arguments in opposition to the renewed motion to compel arbitration. The magistrate judge disagreed on all counts. Plaintiffs have not objected to his analysis of the waiver issue. Therefore, I need not review that portion of the order. Fed.R.Civ.P. 72(b)(3). *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) ("[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings"). The appeal therefore boils down to two issues: first, whether the plaintiffs agreed to arbitrate their disputes; and second, even if they did agree, whether the arbitration agreement is enforceable.

## A. *Plaintiffs' Assent to the Arbitration Clause.*

■ Plaintiff argues that they did not assent or agree to the arbitration clause, essentially because it was presented in such a convoluted manner that it was hidden from them. None of the plaintiffs actually "signed" the Subscriber Agreement in the conventional sense. In fact, with the exception of Mr. Moore who received a copy of the Subscriber Agreement with his welcome letter—a practice that Qwest followed only for a short period of time—the plaintiffs never were provided with a paper copy of the document. Rather, they had to follow instructions provided during their enrollment in the program to find the Subscriber Agreement on Qwest's website. Apparently, none of them did jump through the hoops, find, and read the Subscriber Agreement. They argue that

they did not knowingly agree to its terms and conditions.

In *Grosvenor v. Qwest Corp.,* no. 09CV2848, two judges in this district addressed this very contract and some of the same issues as are presented here. As here, Mr. Grosvenor had subscribed to Qwest's Price for Life Program. Unlike the present case, his dispute arose from his contention that Qwest raised the rate it charged for its Internet service, in violation of the Program's promise not to do so. However, as in the present case, he sought to represent a class of Qwest internet customers. As here, Qwest moved to compel arbitration.

Judge Miller denied the motion. *Grosvenor,* 2010 WL 3906253 (D.Colo. Sept. 30, 2010). The court held that a motion to compel arbitration under the Federal Arbitration Act is governed by a standard similar to that governing motions for summary judgment. *Id.* at *5. The court further found that there were genuine issues of material fact as to whether Mr. Grosvenor received the Subscriber Agreement, whether he received the welcome letter, and therefore, whether he agreed to arbitrate his claims that precluded a ruling as a matter of law. *Id.* at *8–10.

After the parties conducted discovery related to the contract formation issue, they filed cross-motions for summary judgment on the question whether there was a binding and enforceable agreement to arbitrate. Judge Krieger analyzed the terms of the contract and concluded that its terms were reasonably conspicuous; that Mr. Grosvenor had accepted all of the terms of the Subscriber Agreement; and that he was contractually bound to arbitrate. *Grosvenor v. Qwest Corp.,* 854 F.Supp.2d 1021, 1026–1031 (D.Colo.2012).

I need not repeat Judge Krieger's detailed discussion. Suffice it to say that I

agree with it and with Magistrate Judge Shaffer's thorough discussion of the issue and its application to the facts in the present case. Shaffer Order at 18–26. I find that the terms of the Subscriber Agreement were reasonably conspicuous, and that plaintiffs' assent was unambiguous. I reach this conclusion because, although the plaintiffs would have had to go to the Qwest website to access the terms of the Subscriber Agreement (except Mr. Moore), they were sufficiently warned that there was an arbitration clause, and that Qwest's liability was limited by the terms of the Subscriber Agreement. At each stage of the enrollment process the consumer was referred to the Subscriber Agreement and, in some instances, specifically to the existence of an arbitration clause. Consumers were informed, more than once, that proceeding to enroll in the Program constituted an agreement to be bound by the terms and conditions in the Subscriber Agreement. Even if they enrolled without going to and reading the Subscriber Agreement, they were given the opportunity to cancel within 30 days if they determined during that period that they were not comfortable with the terms and conditions.

■ Subscribers who enrolled online were subject to a clickwrap agreement, as were all of the customers who used the Quickconnect Install CD. "Clickwrap is a commonly used term for agreements requiring a computer user to 'consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with [a] ... transaction.'" *Hancock v. AT & T Co., Inc.*, 701 F.3d 1248, 1255 (10th Cir. 2012) (quoting *Feldman v. Google. Inc.*, 513 F.Supp.2d 229, 236 (E.D.Pa.2007)). "Clickwrap agreements are increasingly common and 'have routinely been upheld.'" *Id.* at 1256 (quoting *Smallwood v. NCsoft Corp.*, 730 F.Supp.2d 1213, 1226 (D.Haw.2010)). There have been instances in which courts have not been satisfied

with the procedure. E.g., *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 28–32 (2d Cir.2002). I agree with Judge Krieger, however, that the facts of *Specht* and several other cases she discussed are sufficiently different that they do not compel a similar result here. *Grosvenor*, 854 F.Supp.2d at 1028–29.

The four plaintiffs here apparently did not access or read the Subscriber Agreement. As one who has agreed to contractual terms presented electronically and who has signed his share of forms and consents without reading them, I can relate to that. However, if one chooses to "sign" a contract and to accept its benefits without reading and understanding its terms, he generally must accept the consequences of his decision. We live in an electronic age. It is commonplace these days to enter into agreements electronically. This very agreement, after all, was to purchase high-speed Internet service. The consumer might not be expected to ferret out a liability-limiting clause that is buried somewhere in "fine print" in a morass of legalese. But, that was not the case here.

Could Qwest's process have been more user-friendly? Yes. Did Qwest go out of its way to make accessing the Subscriber Agreement as easy as possible, such as by providing a hyperlink that would provide instant access? No. But, I am satisfied that plaintiffs had a reasonable opportunity to access the Subscriber Agreement had they wished to do so. They received repeated instructions to do so as well as warnings that by enrolling in the Program they were agreeing to be bound by the terms and conditions of the program. They accepted the benefits of the Price for Life Program, and I conclude that they are bound by the arbitration and class action waiver terms.

### B. *Enforceability of the Arbitration Agreement.*

Plaintiffs contend that the arbitration agreement is not enforceable for two reasons: it is illusory, and it is unconscionable.

#### 1. *Is the contract illusory?*

■ Paragraph 4 of the Subscriber Agreement [# 27–2], under the caption "Changes to Service or this Agreement," provides that "Qwest is not obligated to give you notice of changes to this Agreement before it becomes effective." However, it then provides that subject to any applicable rules or laws, Qwest may:

(a) *at any time, effective upon posting to www.qwest.com/legal or any written notice to you, including email:* (i) stop offering the Service and/or rental Equipment, (ii) modify the Service and/or any of the terms and conditions of this Agreement, and/or (iii) reduce MRCs or NRCs. Please check such Web site and your email regularly for changes.

(b) *upon 30 days notice to you:* (i) increase MRCs and/or NRCs or (ii) change this Agreement or the Service in a way that directly results in a material and adverse economic impact to you. Qwest may reduce the foregoing notice period where commercially reasonable and/or if such increase is based on Regulatory Activity.

Your continued use of the Service and/or Equipment constitutes acceptance of those changes. You must immediately stop using the Service and Equipment and cancel your Service if you do not agree to the changes. Any changes or other terms you make to this Agree-ment, or propose in any other documents, written or electronic, are void. *Id.* at 6.

Plaintiffs argue that Qwest's right unilaterally to modify any of the terms and conditions of the Subscriber Agreement, including necessarily the arbitration clause, render the contract illusory. Plaintiffs successfully made a similar argument in *Grosvenor.* The court concluded that *Dumais v. American Golf Corp.,* 299 F.3d 1216 (10th Cir.2002) was controlling, and that "[b]ecause Qwest retained an unfettered ability to modify the existence, terms and scope of the arbitration clause, it is illusory and unenforceable." 854 F.Supp.2d at 1034.

In contrast, in the present case the magistrate judge found that the contract does not create an unfettered ability to modify the arbitration clause. In his analysis, Judge Shaffer relied on Colorado law and on *Hardin,* 465 F.3d 470, which distinguished *Dumais.* He concluded on that basis that the contract was not fatally illusory. Magistrate Judge Order, 857 F.Supp.2d at 1154–56.

In *Dumais,* an employee handbook contained an agreement to arbitrate employment claims. In one section of the handbook the employer reserved its right to modify any provision of the handbook in its sole discretion except an employee's "at-will" status and the arbitration provision. However, on the signature page of the handbook where the employee acknowledged reading and understanding the handbook's provision, the employer reserved the right to modify anything in the handbook except the employee's at-will status. Construing the ambiguity created by this inconsistency against the employer as the draftsman of the agreement, the court concluded that the employer had an unfettered right to alter the arbitration agreement's existence or scope, which ren-

dered the arbitration agreement illusory and unenforceable. *Id.* at 1219–20.

In *Hardin,* decided by the Tenth Circuit four years after *Dumais,* the employer's "Dispute Resolution Agreement" required employees to submit all employment-related legal disputes to arbitration. The Agreement provided, however, that the employer retained the right to terminate or modify the Agreement with two exceptions: (1) no amendment of the Agreement would apply to claims or disputes of which the employer had notice on the date of the amendment; and (2) termination of the Agreement would not be effective until 10 days after reasonable notice of termination was given to the employee or as to claims or disputes which arose prior to the date of termination. Thus, the employer's right to alter the arbitration agreement was not unrestricted. Those limitations were deemed to be sufficient to distinguish *Dumais* and to avoid rendering the agreement to arbitrate illusory. 465 F.3d at 478.

Reasonable minds can, and obviously have, differed as to whether the present facts are more similar to those of *Dumais* or *Hardin.* Paragraph 4 of the Subscriber Agreement begins with the bold pronouncement that "Qwest is not obligated to give you notice of changes to this Agreement before it becomes effective." However, the paragraph clarifies that Qwest may "at any time, effective upon posting to www.qwest.com/legal or any written notice to you, including email ... modify the Service and/or any of the terms and conditions of this Agreement...." Subscriber Agreement [# 27–2] ¶ 4(a). And, if the modification "directly results in a material and adverse economic impact to you," Qwest must give the subscriber 30 days' notice, during which time the subscriber can terminate the service if he does not agree to the change.

This poorly drafted section of the Subscriber Agreement could be viewed as internally inconsistent, therefore ambiguous, and therefore construed "within the confines of the particular litigation" against the draftsman. *See Dumais,* 299 F.3d at 1219. This in turn could support the conclusion that Qwest could unilaterally modify the arbitration clause without notice, which would potentially expose the clause as illusory. However, I am not convinced.

First, in my view construing paragraph 4 in that manner would amount to straining to find a justification to hold the arbitration clause unenforceable. That goes against the grain of *Concepcion* which strongly reaffirmed the deference that courts must give to arbitration agreements. I construe paragraph 4 as requiring some notice. If one can imagine a scenario where Qwest would want to modify the arbitration clause, however unlikely that might be, and the equally unlikely scenario where the modification would be viewed as materially adverse to the subscriber, then 30 days' notice is required. If the modification were not viewed as materially adverse to the subscriber, then notice is required at least by posting on the website. The existence of a notice requirement, however minimal, would seem to take the agreement out of *Dumais* and into *Hardin.*

Second, if the Court construed the contract as giving Qwest the unfettered ability to modify the arbitration clause without notice, then plaintiffs' argument that this would render the clause illusory proves too much. Under that argument the entire Subscriber Agreement would be illusory and unenforceable. Courts cannot discriminate against arbitration clauses. Section 2 of the Federal Arbitration Act, 9 U.S.C. § 2. *See Concepcion,* 131 S.Ct. at 1746.

Third, as the magistrate judge recognized, subscribers agreed to the dispute resolution provisions for good and substantial consideration. Enforcing the contract in that circumstance is consistent with Colorado contract law. For example, in *Rains v. Foundation Health Systems Life & Health,* 23 P.3d 1249 (Colo.App.2001) the court rejected an argument that an arbitration provision was unconscionable and therefore unenforceable because the obligation to arbitrate was not mutual. "Under Colorado law, every contractual obligation need not be mutual as long as each party has provided some consideration for the contract." *Id.* at 1255. Thus, because each party to the contract had provided consideration, "the arbitration provision is not unenforceable simply because it does not require defendant to arbitrate." *Id.*

I acknowledge that upon receiving notice of a change that the subscriber does not like, his or her only recourse is to terminate the service. The subscriber does not have the right to reject the change, which was a key point for Judge Krieger in *Grosvenor.* 854 F.Supp.2d at 1034. Moreover, if the subscriber elected to terminate the service during the first two years, as in the case of the plaintiffs here, he or she still faced the cancellation fee. But, that was part of the bargain. The subscriber received the benefit of the Price for Life program, ostensibly protecting him or her against price increases during the life of the contract. It does not sit well that, having accepted the benefits, the subscriber wishes to avoid the consequences of having accepted the other terms and conditions that were part of the deal.

Accordingly, I conclude that this arbitration agreement as written is not fatally illusory. This conclusion sticks in my craw a bit. It would have been easy for Qwest to draft the agreement in such a way as to eliminate any argument about its illusory nature. Nevertheless, three judges have now found that subscribers assented to the terms and conditions of this agreement. In the end, I view plaintiffs' argument that the arbitration clause is illusory because Qwest could, in theory, modify it unilaterally as more of a "gotcha" than a serious flaw that compels the conclusion that the arbitration clause must be disregarded. While an agreement that gives a party the absolutely unfettered right to modify the agreement is susceptible to challenge, as in *Dumais,* I cannot conclude that this one must meet the same fate.

### 2. *Is the Contract Unconscionable?*

■ Because she found the arbitration agreement illusory, Judge Krieger was not required to reach or decide the unconscionability argument in *Grosvenor.* Judge Shaffer did address that issue, and once again, I find myself in agreement with him. *See* Magistrate Judge Order, 857 F.Supp.2d at 1156–59.

■ In Colorado, for a contract to be unconscionable, it must be both substantively and procedurally unconscionable. *Davis v. M.L.G. Corp.,* 712 P.2d 985, 991 (Colo.1986). In *Davis,* the Colorado Supreme Court listed seven factors that are relevant in determining whether a contract is unconscionable: (1) a standardized agreement executed by parties of unequal bargaining power; (2) lack of opportunity to read or become familiar with the document before signing it; (3) use of fine print in the portion of the contract containing the provision; (4) absence of evidence that the provision was commercially reasonable; (5) the terms of the contract; (6) the relationship of the parties, including factors of assent, unfair surprise, and notice; and (7) all the circumstances surrounding the formation of the contract. *Id.* at 991.

The first, second, third, sixth, and seventh factors relate to procedural unconscionability. Looking at the first factor, the arbitration agreement at issue was a standardized agreement between parties with unequal bargaining power. However, this factor by itself is not enough for a finding of procedural unconscionability. *Mullan v. Quickie Aircraft Corp.,* 797 F.2d 845, 850–51 (10th Cir.1986). *See also Concepcion,* 131 S.Ct. at 1750 ("the times in which consumer contracts were anything other than adhesive are long past"). The second and third factors concern whether there was an opportunity to read and become familiar with the document before signing it and whether the arbitration provision was hidden in the equivalent of "fine print." All three judges in this district who have considered those issues have resolved them against the plaintiffs' position. The sixth factor requires analysis of the relationship between the parties including issues of assent, notice and unfair surprise. Again, as discussed above, the plaintiffs had notice of the arbitration agreement, it was reasonably conspicuous, and the plaintiffs gave their unambiguous consent. The seventh factor is a catchall that allows for consideration of all of the factors surrounding formation of the contract. I have not identified any circumstances in the formation of this contract that made the arbitration clause procedurally unconscionable.

Plaintiffs also argue that the arbitration agreement is substantively unconscionable. The plaintiffs point out that the terms of the Subscriber Agreement are much less consumer-friendly than those examined by the Supreme Court in *Concepcion.* I agree, but I do not agree that they rise to the level of substantive unconscionability. Under the terms of the Subscriber Agreement the plaintiffs were required to pay half of the arbitrators' fees up to $125 for claims not exceeding $10,000. Plaintiffs argue that this cost would deter consumers from filing suit. That might be true. However, a filing fee is not unique to arbitration. A filing fee is also required in state and federal court, even in small claims court, and $125 is not exorbitant. Moreover, whether the potential recovery is limited to $200 or less (the Subscriber Agreement purports to limit damages to the monthly and usage charges paid by the subscriber during the month preceding the event giving rise to the claim), as plaintiffs fear, or could be supplemented by statutory damages, as defendants argue, is a matter for the arbitrator to address. *See PacifiCare Health Sys., Inc. v. Book,* 538 U.S. 401, 405–407, 123 S.Ct. 1531, 155 L.Ed.2d 578 (2003). In any event, the Court acknowledged in *Concepcion* its ruling could make it such that small dollar claims would slip through the cracks. However, "States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." *Id.* at 1753. Neither can this Court.

## C. *Interlocutory Appeal.*

■ The Federal Arbitration Act permits an appeal from a district court's order declining to compel arbitration. 9 U.S.C. § 16(a)(1)(B). *See Ansari v. Qwest Communications Corp.,* 414 F.3d 1214, 1217 (10th Cir.2005). Although the converse is not true, I recognize that judges in this district disagree as to whether this specific Subscriber Agreement is illusory and therefore unenforceable. The pertinent facts concerning that issue are not disputed. Rather, the issue turns on "a controlling question of law as to which there is substantial ground for difference of opinion." 28 U.S.C. § 1292(b). Also, because plaintiffs cannot arbitrate on a classwide basis, an immediate appeal "may materially advance the ultimate termination of the litigation." *Id.* Accordingly, the Court makes the finding required by 28 U.S.C. § 1292(b).

**Order**

Plaintiffs' objection to the Magistrate Judge's Order [# 164] is DENIED. The Magistrate Judge's Order granting defendants' renewed motion to compel arbitration is affirmed. This action is stayed pending arbitration or, in the discretion of the Court of Appeals, pending an immediate appeal pursuant to 28 U.S.C. § 1292(b).